936 A.2d 438

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
MICHAEL A. O'NEILL, DEFENDANT–APPELLANT.

Argued September 10, 2007—Decided December 20, 2007.

152

*Stephen W. Kirsch,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Deborah C. Bartolomey,* Deputy Attorney General, argued the cause for respondent (*Anne Milgram,* Attorney General of New Jersey, attorney; *Ms. Bartolomey* and *Karen L. Fiorelli,* Deputy Attorney General, on the briefs).

Justice ALBIN delivered the opinion of the Court.

Forty years after *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966), no rule of law is better understood by law enforcement officers than the duty to advise a suspect subject to custodial interrogation of his right to remain silent and his right to the assistance of counsel.[1] Indeed, the term "*Miranda* rights"

---

[1] Twenty years ago in *State v. Hartley,* 103 *N.J.* 252, 511 *A.*2d 80 (1986), we expressed our confidence "that by now the police are intimately familiar with

is now so familiar that it is part of our popular vocabulary and culture. Significantly, *Miranda*'s guiding principles inform New Jersey's privilege against self-incrimination.

In this case, two homicide detectives subjected defendant Michael A. O'Neill to a ninety-five minute interrogation while he was in official custody, eliciting from him incriminating statements that linked him to the killing of Luis Tenezaca, a taxi cab driver. Only then, for the first time, did the detectives advise defendant of his *Miranda* rights. Without any significant break, the detectives resumed the interrogation, questioning the nineteen-year-old defendant for nearly five more hours, taking two taped statements, which, singly and together, directly connected him to the shooting death of the cab driver.

At defendant's murder trial, the State only sought to admit defendant's statements made after the initial ninety-five minute unwarned interrogation. The trial court denied defendant's motion to suppress statements he made after receiving the *Miranda* warnings. The prosecution used defendant's own words—his statements to the detectives—to convict him of felony murder and related offenses. The Appellate Division upheld those convictions, finding that defendant knowingly, voluntarily, and intelligently waived his *Miranda* rights on the heels of the damning admissions elicited from him during the initial ninety-five minute unwarned interrogation.

Because of the unsettled state of federal law construing the two-stage interrogation technique under the Fifth Amendment, and because our state law against self-incrimination accords New Jersey's citizens broader protection than afforded under the Federal Constitution, we will decide this issue on state law grounds. We now conclude that the "question-first, warn-later" interroga-

---

*Miranda* and what that case requires by way of warnings." *Id.* at 255 n. 1, 511 A.2d 80; *see also Dickerson v. United States*, 530 *U.S.* 428, 443, 120 *S.Ct.* 2326, 2336, 147 *L.Ed.*2d 405, 419 (2000) (*"Miranda* has become embedded in routine police practice to the point where the warnings have become part of our national culture.").

tion procedure in this case violated defendant's state law privilege against self-incrimination. That privilege was rendered illusory because the detectives exploited defendant's admissions from the initial unwarned questioning, undermining his ability to knowingly, voluntarily, and intelligently waive the *Miranda* rights later given to him. We therefore are compelled to suppress defendant's post-warning statements, reverse his convictions, and order a new trial.

I.

A.

The trial court conducted a pre-trial hearing to determine the admissibility of defendant's statements to Union City Police Detective Michelle Luster and Detective Robert Bava of the Hudson County Prosecutor's Office.[2] Detective Luster was the only witness to testify at that hearing.

### Unwarned Statement

At the time of Tenezaca's killing in the early morning hours of April 26, 2003, Detective Luster was assigned to the Hudson County Prosecutor's Homicide Unit. On April 28, 2003, at approximately 3:10 p.m., she and Detective Bava arrived at the Harrison Police Department to question defendant O'Neill, who had been arrested on an outstanding warrant unrelated to the Tenezaca homicide. The two detectives had information that defendant possessed a handgun within the timeframe of that homicide.

Detectives Luster and Bava identified themselves to defendant, who was in a holding cell, and questioned him through the bars. Without informing defendant of his *Miranda* rights, they asked him to account for his whereabouts for the period between 11 p.m. on April 25 and 3 a.m. on April 26. Defendant responded that he had been babysitting for a friend, Jamie Noack, who lived in

---

[2] At the time of her testimony at defendant's trial, Detective Luster had been promoted to the position of Sergeant in the Union City Police Department. For the sake of clarity, we refer to her here as a detective.

Harrison. When the detectives told him that they intended to verify that information, he recanted, stating that he had left the Noack house at approximately 11 p.m. and had walked around the neighborhood for the next two hours. Defendant denied that he had been in the area of the Solda Espana bar in Kearny where the victim had picked up his last fare. However, when the detectives displayed his photograph to him and asked whether anyone would place him in the bar once shown that photograph, defendant recanted again, admitting, "Well, yes, I did go there to meet a friend."

Based on those answers, twenty minutes into the interview, the detectives moved defendant from his cell to the patrol commander's office. There, the interrogation continued, and still no *Miranda* warnings were given. During the next hour and fifteen minutes, defendant told the detectives that, in fact, he had gone to the Solda Espana bar to purchase marijuana from a friend he knew only as "V". While at the bar, V, who was accompanied by a Hispanic male, directed defendant to take the next available cab to the intersection of Seeley and Columbia Avenues in Kearny. It was defendant's understanding that V and his friend planned to rob the cab driver after defendant lured him to the intersection. For his role, defendant expected to be paid in one of two currencies: money or marijuana.

## Miranda Warnings

At that point, ninety-five minutes into the interrogation, at 4:45 p.m., the detectives gave defendant the *Miranda* warnings. Additionally, defendant read a standard *Miranda* form listing his rights and acknowledged receiving and waiving those rights by signing the form.[3] Defendant then completed his account of the

---

[3] The warnings on the form provided the following: (1) "you have the right to remain silent;" (2) "anything you say can and will be used against you in a court of law;" (3) "you have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning;" (4) "if you cannot afford a lawyer one will be appointed for you before any questioning if you wish;" (5) "if you decide to answer questions now without a lawyer present you

"planned robbery" of the cab driver. He explained that he caught a cab outside of the bar and directed the driver to take him to the intersection of Seeley and Columbia Avenues in Kearny. The driver, however, could not find the location.[4] Defendant aborted the mission by advising the driver to stop and then exited the vehicle.

### First Taped Statement

At approximately 5:20 p.m., at the detectives' request, defendant gave a taped statement. On the record, the detectives again advised defendant of his *Miranda* rights, and defendant agreed to talk. Detective Bava began the questioning by cueing him to his earlier unwarned interrogation: "Michael before we started this tape we spoke about this incident where the cab driver was shot is that correct?"

Defendant then recounted many of the same details he provided to the officers before being given the *Miranda* warnings. He repeated that he went to the bar looking for V, his marijuana supplier, and, once there, V told him to "take the next available cab" to the intersection of Seeley and Columbia in Kearny. As in his earlier unwarned statement, defendant admitted to having "a feeling [V] was gonna rob the guy." In return for his role, he expected payment of "four or five bags of weed" or "20, or 50 dollars whatever." As he did after receiving the *Miranda* warnings, defendant stated again that he abandoned the robbery scheme after the cab driver got lost, leaving the cab without paying the fare.

---

still have the right to [stop] answering at any time. You also have the right to stop answering at any time until you talk to a lawyer."

The bottom of the form contained waiver-of-rights language and a line for a signature by which the person acknowledges that he understands his rights, is willing to make a statement, does not want a lawyer, and that no promises or threats have been made or coercion or pressure used against him.

4 It should be noted that Seeley and Columbia Avenues run parallel to each other and do not intersect.

Defendant added that after the cab driver's shooting, "a big rumor was going around town that [he] had a pistol in [the Noack] house." He claimed that he had not "the slightest idea" how the rumor originated. Nonetheless, the rumor resulted in Mrs. Noack kicking him out of her home. The taped questioning lasted thirty minutes, concluding at 5:50 p.m.

### Continued Off–Tape Questioning

During a ten-minute break, the detectives learned that a witness claiming to have seen defendant with a handgun was en route to headquarters. By 6 p.m., Detectives Luster and Bava returned to the commander's office and told defendant the news. Defendant then admitted that he had possessed and discarded a .40 caliber silver handgun that he had stolen a week earlier from a family friend in Virginia. He described throwing the weapon down a sewer at the intersection of Central and Davis Avenues in Harrison.

At 6:30 p.m., Detectives Luster and Bava transported defendant to the Hudson County Prosecutor's office in Jersey City. On the way, they stopped at the intersection where defendant had claimed to have disposed of the weapon. The handgun was never found. During that trip, the detectives advised defendant that they believed he was minimizing his involvement in the cab driver's death. Defendant responded by saying, "prove it."

At 6:45 p.m., defendant was placed in a holding cell in the prosecutor's office. Shortly afterwards, the two detectives learned that the Prosecutor's Homicide Unit had secured from the Noack family a bloodstained black jacket and a black glove, both reportedly worn by defendant.

At approximately 7:10 p.m., Detectives Luster and Bava confronted defendant, still in the holding cell, with the evidence. Defendant then confessed: "Okay, you got me. It was an accident and I'll tell you what happened." The officers next transferred defendant to an interview room, where he was questioned for an hour and a half before a second taped statement was taken.

Defendant was not given *Miranda* warnings prior to that questioning.

*Second Taped Statement*

At 8:47 p.m., defendant gave a thirty-minute taped statement, covering the same ground plowed during the pre-tape interview. First, Detective Bava reminded defendant that his rights had been read to him earlier in the day. After acknowledging that he understood his rights, defendant provided an account of the events leading to the death of Luis Tenezaca—an account at variance with his earlier statements. Although defendant maintained that he had gone to the bar to purchase marijuana from V and that V had instructed him to take a cab to a certain Kearny intersection, he now disavowed that there had been a plan to rob the cab driver.

Defendant stated that V got into an altercation with a drunken Hispanic man outside the bar. When the man uttered racial slurs at V, who is African–American, V struck the man, knocking him out. V, enraged, stated: "If I had a burner I'd shoot him." With that, defendant volunteered that he had a gun at home he could sell to V, and V told him to get it. Defendant went home, secured his chrome .40 caliber Ruger, and displayed it to V. Then, V directed defendant to bring the weapon to the intersection of Columbia and Seeley in Kearny.

Afterwards, defendant hailed a cab at the bar and instructed the driver to take him to that intersection. The cab driver, who had difficulty with English, apparently could not find his way there, and defendant asked him to stop on Argyle Place. As defendant began to exit from the back passenger door, the driver grabbed his hand and said, "No get out the cab, no get out the cab you must pay." Defendant replied, "Listen I don't have my wallet with me." The driver threatened, "No, no, no I call cops" and picked up his radio. At that point, defendant pulled out the Ruger to scare the driver and said, "Let go of me, or you're gonna wear it." The driver then released defendant's hand. With his finger on the trigger of the gun, defendant started to step out of the cab,

when the driver hit the gas, throwing defendant back into the cab and causing "a round [to go] off." Defendant claimed that the gun accidentally discharged and that he did not intend to rob or kill the driver.

Defendant ran from the scene as the cab crashed into a telephone pole. On his way back to the Noack home, he dropped one of the two gloves that he was wearing down a sewer. He kept the other glove to wipe down the gun, which he later hid in a bag under his mattress. When Mrs. Noack found the gun, she told defendant that he was not welcome in her home any longer. Defendant then took the gun and threw it down a sewer.

### Ruling on Suppression Motion

Based on Detective Luster's testimony and defendant's recorded statements and signed *Miranda* form, the trial court denied the suppression motion. The court concluded that the State had proved beyond a reasonable doubt that defendant received the *Miranda* warnings and knowingly and voluntarily waived his rights. All statements made by defendant following the *Miranda* warnings were therefore admitted into evidence.

### B.

In addition to offering defendant's own words to the jury, the State called a number of witnesses connecting defendant to Tenezaca's shooting death. A summary of the most compelling testimony follows.

Deborah Noack testified that defendant was a friend of her son Michael and that he came to live with her family in Harrison in December 2002 because defendant had "nowhere else to go." On the evening of April 27, 2003, she received a telephone call indicating that a gun was in her house. She then searched Michael's room, where defendant had been staying, and discovered the gun in a plastic bag tucked under the mattress. When defendant returned to the house, her husband ordered him to pack his belongings and leave. A short while later, defendant told the

Noacks that he had to get rid of the book bag he had in his hand. Mrs. Noack believed that the bag contained the gun. Defendant left and later returned with the book bag empty. He then gathered his clothes and walked off. The Noacks turned over to the police some of Michael's clothes that had been worn by defendant, including a bloodstained jacket. DNA tests confirmed that it was Luis Tenezaca's blood on the jacket.

Michael Noack testified that while detained in the Hudson County Jail on assault and robbery charges, he had several conversations with defendant related to the killing of the cab driver. In an April 25, 2003 telephone call, defendant told Noack that he was planning to raise Noack's bail money by committing a robbery with a .40 caliber Ruger that he had acquired in Virginia. The next day, during another call, defendant explained that he had entered a cab intending to rob the driver and that he shot the driver after the driver refused to allow him to exit the vehicle. Defendant claimed in the telephone conversation that the gun went off when the driver abruptly accelerated, jerking him backwards.[5] Defendant also told Noack that he wore gloves so that no gun residue would get on his hands and then discarded the weapon on railroad tracks.

Also called to the stand was Christine Lagoa, defendant's ex-girlfriend. She identified a letter, dated May 7, 2003, sent to her by defendant from the Hudson County Correctional Center. In that letter, defendant explained that he entered the cab planning to sell his gun, but that the driver got lost. When he tried to exit the cab, the driver grabbed his wrist and demanded that he pay the fare, threatening to call the police. Defendant then "pulled out the Ruger and put it to [the driver's] head and cocked it back," and told him to let go of his hand. After the driver released his

---

[5] Noack later gave a different version of his telephone conversation with defendant. In that version, defendant recounted to Noack that the cab driver punched and taunted defendant and then said that defendant "didn't have the balls to pull the trigger." That prompted defendant to reply, "Yeah, you want to make a bet," and to fire the Ruger.

wrist, defendant "kept the gun pointed at him," and placed a foot outside of the door when, suddenly, "the driver pressed the accelerator," throwing defendant back and causing him to "release[ ] a round accidentally."

Detectives Brian Mueller and David Whipple of the Hudson County Prosecutor's Office both gave testimony describing a verbal exchange that occurred on the evening of April 28, 2003, as they transported defendant to the county jail after his interrogation in the prosecutor's office. During the ride, defendant asked, "[I]s it true that I shot him in the back of the head?" Detective Mueller responded, "[W]ell, yes, you were there." While gazing out the car window, defendant then said, "I'm not surprised because that's where I was aiming." [6]

Additional testimony offered by law enforcement witnesses revealed that Luis Tenezaca died from a gunshot wound to the back of his head. He was found in his cab, which had crashed into a telephone pole, with his foot still pressed against the gas pedal. In searching the cab, the police discovered a .40 caliber bullet shell casing on a blood-soaked backseat floor mat. Also recovered were Tenezaca's cell phone from the cab's visor, an envelope with a check in the victim's shirt pocket, and his wallet containing $110 in the driver's side door. There was no indication that property or money had been taken from the victim or his cab.

Defendant took the stand in his own defense. His testimony, for the most part, was consistent with both his second-taped statement and his letter to Christine Lagoa, in which he claimed that his gun accidentally discharged killing the cab driver.[7] He claimed that his first statement to the detectives—in which he admitted that he was part of a plan to rob the cab driver—was not

---

[6] At a *N.J.R.E.* 104 hearing, the court denied defendant's motion to suppress the statements ascribed to him during the car ride. Defendant has not challenged the admissibility of those statements in his appeal to this Court.

[7] Defendant denied making the statements attributed to him during the ride to the county jail.

the truth. He insisted that he had no intent to rob or kill the driver, or even beat the fare.

### C.

■ At the conclusion of the trial, the jury convicted defendant of felony murder, *N.J.S.A.* 2C:11–3(a)(3); first-degree robbery, *N.J.S.A.* 2C:15–1; first-degree aggravated manslaughter, *N.J.S.A.* 2C:11–4(a)(1); third-degree unlawful possession of a weapon, *N.J.S.A.* 2C:39–5(b); and second-degree possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4(a). The jury found defendant not guilty of purposeful or knowing murder, *N.J.S.A.* 2C:11–3(a)(1), *N.J.S.A.* 2C:11–3(a)(2).

The trial court sentenced defendant to a thirty-year term of imprisonment without parole eligibility on the felony murder conviction. The court merged the convictions for aggravated manslaughter, robbery, and possession of a weapon for an unlawful purpose into the felony murder conviction, and merged the unlawful possession of a weapon conviction into the possession of a weapon for an unlawful purpose conviction.[8] The court also ordered that defendant serve a five-year period of parole supervision following his release from prison and that he pay certain statutorily-prescribed fines.

### D.

Defendant appealed, arguing that his rights guaranteed by *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966), were violated by the "two-stage, 'question-first, warn later'

---

[8] The trial court improperly merged the conviction for unlawful possession of a weapon into the possession of a weapon for unlawful purpose conviction. *N.J.S.A.* 2C:39–5(b) prohibits a person from possessing a gun without having the appropriate permit whereas *N.J.S.A.* 2C:39–4(a) prohibits a person from possessing a gun with the intent to use it unlawfully. *N.J.S.A.* 2C:39–5(b) is not a lesser-included offense within the meaning of *N.J.S.A.* 2C:1–8(d). *See State v. Cooper,* 211 *N.J.Super.* 1, 22–23, 510 A.2d 681 (App.Div.1986) (Long, J.A.D.) (citing *State v. Latimore,* 197 *N.J.Super.* 197, 215–16, 484 A.2d 702 (App.Div.1984)).

interrogation technique" used by Detectives Luster and Bava.[9]
*State v. O'Neill*, 388 *N.J.Super.* 135, 136–37, 906 *A.*2d 495 (App.
Div.2006). The Appellate Division rejected that claim and upheld
the order denying suppression of defendant's post-*Miranda* state-
ments. *Ibid.*

In disposing of the issue, the panel turned to *Missouri v.
Seibert*, 542 *U.S.* 600, 124 *S.Ct.* 2601, 159 *L.Ed.*2d 643 (2004), which
addressed " '[t]he technique of interrogating in successive, un-
warned and warned phases.' " *O'Neill, supra,* 388 *N.J.Super.* at
145, 906 *A.*2d 495 (quoting *Seibert, supra,* 542 *U.S.* at 609, 124
*S.Ct.* at 2608, 159 *L.Ed.*2d at 653). Although five members of the
United States Supreme Court concurred in overturning Mrs.
Seibert's conviction, all five did not agree on how to arrive at that
result. *Id.* at 145–46, 906 *A.*2d 495. The four-member *Seibert*
plurality established a five-factor test for courts to apply in
determining the admissibility of a post-warning second confession
that follows an earlier confession elicited without *Miranda* warn-
ings. *Id.* at 146, 906 *A.*2d 495. The plurality focused on whether
the warnings " 'could function "effectively" as *Miranda* requires' "
when " 'investigators question first and warn later.' " *Ibid.* (quot-
ing *Seibert, supra,* 542 *U.S.* at 611–12, 124 *S.Ct.* at 2610, 159
*L.Ed.*2d at 655).

Justice Kennedy provided the fifth vote for reversing Mrs.
Seibert's convictions, but on different grounds. In concurring, he
held that " 'a multifactor test that applies to every two-stage
interrogation may serve to undermine [*Miranda*'s ] clarity' " and
that he " 'would apply a narrower test applicable only in the
infrequent case . . . in which the two-step interrogation technique
was used in a calculated way to undermine the *Miranda* warn-
ing.' " *Id.* at 147, 906 *A.*2d 495 (quoting *Seibert, supra,* 542 *U.S.*

---

[9] The State argued that because defendant did not raise that issue at the
*Miranda* hearing, there was an inadequate record to address defendant's claim
that his right against self-incrimination was violated by the police's two-step
interrogation. The Appellate Division ruled as though the record were sufficient
to decide the issue.

at 622, 124 *S.Ct.* at 2616, 159 *L.Ed.*2d at 661 (Kennedy, J., concurring)).

The Appellate Division maintained that the applicable standard was not the one articulated by the *Seibert* plurality, but rather the one supplied by Justice Kennedy because he "concurred with the plurality on the narrowest grounds." *Id.* at 148, 906 *A.*2d 495 (citation omitted). The panel determined that Detectives Bava and Luster did not act in a calculated way to undermine defendant's *Miranda* rights and, more particularly, "did not use a prewarning inculpatory statement from defendant to obtain a repeat or duplicate" statement after the *Miranda* warnings were given. *Id.* at 148, 906 *A.*2d 495.

The panel acknowledged that the "technique of withholding warnings until after [an] interrogation succeeds in eliciting a confession" would likely render later *Miranda* warnings "ineffective" in the case of back-to-back interrogation sessions covering the same subject. *Ibid.* The panel, however, did not consider the incriminating statements made by defendant to be the product of a "mere continuation" of an earlier interrogation conducted without *Miranda* warnings. *Ibid.* In the panel's view, defendant's unwarned and warned statements were not only substantially different, but also taken at different times and locations. *Ibid.* The panel therefore affirmed defendant's felony murder conviction. *Id.* at 149, 906 *A.*2d 495.

We granted defendant's petition for certification. 189 *N.J.* 426, 915 *A.*2d 1049 (2007).

## II.

Defendant submits that the Appellate Division decision will allow the police "to run roughshod over the *Miranda* rights of criminal defendants by questioning them without *Miranda* warnings until they 'crack' and then repeating the whole interrogation once the defendant is properly warned." He argues that this Court should follow the plurality view in *Seibert,* noting that Justice Kennedy's approach was rejected by all eight other mem-

bers of the Supreme Court. Nonetheless, he submits that the ask-first, warn-later questioning technique used in this case "is the very type of calculated attempt to break the will of the defendant" that is condemned by both the plurality and Justice Kennedy in his concurrence. In urging a reversal of the panel's decision, defendant contends that the interrogation procedure directly violated *Miranda*, as well as the right against self-incrimination protected by both the Federal Constitution and state law. Defendant also would have this Court mandate that as a precondition to the admissibility of post-warning statements in a two-step interrogation, the police must inform a suspect that his unwarned statements cannot be used against him.

In contrast, the State offers several arguments in support of the panel's decision affirming the admission of defendant's post-*Miranda* statements.[10] First, the State submits that the detectives' initial questioning of defendant, while he was held on unrelated charges in the Harrison Police Department, did not constitute a custodial interrogation for *Miranda* purposes until defendant incriminated himself in the Tenezaca murder investigation. By that reasoning, there was no *Miranda* violation, and the initial unwarned statement could have been admitted into evidence.[11] Alternatively, the State contends that this Court should not "suppress defendant's fully warned and freely-made statements just because his first statement, although freely made, was not preceded by *Miranda* warnings." Relying on *Oregon v. Elstad*, 470 *U.S.* 298, 309, 105 *S.Ct.* 1285, 1293, 84 *L.Ed.*2d 222, 232 (1985), the State maintains that because the detectives did not deliberately withhold

---

[10] As in the Appellate Division, the State again contends that defendant's failure to raise the two-step interrogation issue at the *Miranda* hearing did not allow for a sufficient record to be developed to address that claim. By its decision, the Appellate Division implicitly expressed its satisfaction with the sufficiency of the record. We too find the record adequate to address the issues before the Court.

[11] At trial, the State did not attempt to admit any of defendant's statements made during the unwarned interrogation.

the *Miranda* warnings before initially questioning defendant, the admissibility of the later warned statements should be judged on the basis of whether they were knowingly and voluntarily given. Last, the State urges that any error in admitting defendant's statements was harmless based on the overwhelming evidence of his guilt.

## III.

### A.

One of the most fundamental rights protected by both the Federal Constitution and state law is the right against self-incrimination. *See U.S. Const.* amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself. . . ."); *N.J.S.A.* 2A:84A–19 ("[E]very natural person has a right to refuse to disclose in an action or to a police officer or other official any matter that will incriminate him. . . ."); *N.J.R.E.* 503 (same). In *Miranda, supra,* the United States Supreme Court, through the prism of the Fifth Amendment privilege against self-incrimination, examined the constitutionality of interrogations in a stationhouse or "police-dominated atmosphere," where the individual is "cut off from the outside world" and subject to questioning by police officers without a full awareness of his constitutional rights. 384 *U.S.* at 445, 86 *S.Ct.* at 1612, 16 *L.Ed.*2d at 707. The Court understood that "[a]n individual swept from familiar surroundings into police custody" would be subject to "techniques of persuasion," primarily psychological, that would create a "compulsion to speak," undermining the individual's ability to exercise the privilege. *Id.* at 461, 86 *S.Ct.* at 1621, 16 *L.Ed.*2d at 716. The Court resolved to put in place safeguards to protect the privilege and counteract the "inherently compelling pressures which work to undermine the individual's will to resist and to compel [an individual subject to custodial interrogation] to speak where he would not otherwise do so freely." *Id.* at 467, 86 *S.Ct.* at 1624, 16 *L.Ed.*2d at 719.

To ensure that an individual would have a meaningful opportunity to exercise the privilege, the Court decreed that an individual who is "subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way," *id.* at 477, 86 *S.Ct.* at 1629, 16 *L.Ed.*2d at 725, "must be adequately and effectively apprised of his rights," *id.* at 467, 86 *S.Ct.* at 1624, 16 *L.Ed.*2d at 719. To that end, the Court mandated that "unless other fully effective means are adopted to notify the person of his right of silence," the following warnings must be given to a person in police custody before interrogation begins:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation.
>
> [*Id.* at 479, 86 *S.Ct.* at 1630, 16 *L.Ed.*2d at 726.]

The Court held that after the individual is advised of his rights and given an opportunity to exercise them, he then "may knowingly and intelligently waive [them] and agree to answer questions or make a statement." *Ibid.* Unless the prosecution demonstrates that the individual was informed of his rights and knowingly, voluntarily, and intelligently waived them, "no evidence obtained as a result of interrogation can be used against him." *Ibid.*[12]

Today, the *Miranda* warnings play an important role in enhancing and safeguarding our state law privilege, and *Miranda* is a strong force in the development of our decisional law. *State v. Reed*, 133 *N.J.* 237, 258–59, 627 *A.*2d 630 (1993) (noting that "we

---

[12] Under our state law, the prosecution at a *Miranda* hearing must prove beyond a reasonable doubt that a defendant's waiver of the privilege was knowing, intelligent, and voluntary, *State v. Presha*, 163 *N.J.* 304, 313, 748 *A.*2d 1108 (2000), whereas under federal law, the burden is on the government to "prove waiver only by a preponderance of the evidence," *Colorado v. Connelly*, 479 *U.S.* 157, 168, 107 *S.Ct.* 515, 522, 93 *L.Ed.*2d 473, 485 (1986).

have stressed, as a matter of state law" that principles of *Miranda* inform our privilege against self-incrimination).

### B.

 With those principles in mind, we begin by rejecting the State's argument that defendant was not in custody for *Miranda* purposes at the time Detectives Luster and Bava began questioning him at the Harrison Police Department. Indeed, this case presents the classic stationhouse interrogation contemplated by *Miranda*—a defendant behind bars, deprived of his freedom, questioned by homicide detectives in a coercive police atmosphere without having been told of his right to remain silent or retain an attorney. *See Miranda, supra,* 384 *U.S.* at 444, 86 *S.Ct.* at 1612, 16 *L.Ed.*2d at 706. Simply because defendant was held in a detention cell in the Harrison police station on charges unrelated to the Tenezaca murder does not alter the equation here.

When the two homicide detectives began to interrogate defendant, he was confined in a jail cell, and the detectives already possessed information that he was armed with a handgun at the time of the cab driver's shooting. The detectives did not come to have a casual chat with defendant, but to question him concerning his whereabouts at the time of the driver's killing. At the very least, defendant was a suspect on a potential gun charge and a person of interest in a murder investigation. For twenty minutes, while in his cell, defendant was questioned about his every move during the timeframe of the murder. Then, the detectives transferred defendant to the patrol commander's office, where he was interrogated for another hour and fifteen minutes on the same subject. When defendant told the officers that, on the evening in question, he had gone to a bar to purchase marijuana, he had admitted at that point to an offense—and still no warnings were forthcoming.

 Only after defendant admitted to participating in a plan to rob a cab driver, in the same locale where the victim was known to have picked up his last fare, did the detectives finally advise

defendant of his rights. By then, however, defendant had committed himself to a story, and incriminated himself, and in all likelihood crossed a psychological bridge from which there was no turning back. Because the detectives failed to inform defendant of his *Miranda* rights during the initial ninety-five minute custodial interrogation, under federal law and our state law privilege, no statement made during that period could be used against him. *Id.* at 479, 86 *S.Ct.* at 1630, 16 *L.Ed.*2d at 726; *see also State v. O'Neal,* 190 *N.J.* 601, 616, 921 *A.*2d 1079 (2007).

We next must decide whether the damaging admissions elicited during the unwarned interrogation effectively undermined defendant's ability to exercise his rights when, immediately afterwards, he was given his *Miranda* warnings and the questioning continued. We first look to the unsettled state of the law that has emerged from the United States Supreme Court's decisions on successive unwarned and warned interrogations.

## C.

In *Elstad, supra,* the Court held that a suspect who "respond[s] to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." 470 *U.S.* at 318, 105 *S.Ct.* at 1298, 84 *L.Ed.*2d at 238. In that case, sheriff's officers armed with a warrant for the defendant's arrest went to his home to take him into custody. *Id.* at 300, 105 *S.Ct.* at 1288, 84 *L.Ed.*2d at 226. Once there, an officer told the defendant that he "felt he was involved" in a local burglary, to which the defendant replied, " 'Yes, I was there.' " *Id.* at 301, 105 *S.Ct.* at 1288–89, 84 *L.Ed.*2d at 227. No *Miranda* warnings were given before that exchange. *Ibid.* The defendant then was transported to the sheriff's headquarters where, after receiving *Miranda* warnings, he fully confessed to the crime. *Ibid.* The Oregon Court of Appeals suppressed the defendant's unwarned and warned admissions, concluding that " 'the unconstitutionally obtained statement' " at his home " 'exert[ed] a coercive impact on [the defen-

dant's] later admissions'" at headquarters. *Id.* at 302–03, 105 *S.Ct.* at 1289–90, 84 *L.Ed.*2d at 228 (quoting *State v. Elstad,* 61 *Or.App.* 673, 658 *P.*2d 552, 554–55 (1983)).

■ In reversing the Oregon Court of Appeals, the U.S. Supreme Court rejected the application of the fruit-of-the-poisonous-tree or cat-out-of-the-bag doctrines. *Id.* at 303–04, 105 *S.Ct.* at 1290, 84 *L.Ed.*2d at 228–29.[13] Although the Court conceded that "*Miranda* require[d] that the unwarned admission must be suppressed," *id.* at 309, 105 *S.Ct.* at 1293, 84 *L.Ed.*2d at 232, it maintained that the appropriate inquiry in determining the admissibility of the second statement must focus on whether it was "knowingly and voluntarily made," *ibid.,* when viewed against "the surrounding circumstances and the entire course of police conduct," *id.* at 318, 105 *S.Ct.* at 1298, 84 *L.Ed.*2d at 238. The *Elstad* Court concluded that it would not presume "that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." *Id.* at 309, 105 *S.Ct.* at 1293, 84 *L.Ed.*2d at 232.

---

[13] The fruit-of-the-poisonous-tree doctrine denies the prosecution the use of derivative evidence obtained as a result of a Fourth or Fifth Amendment violation. *United States v. Patane,* 542 *U.S.* 630, 642–44, 124 *S.Ct.* 2620, 2630, 159 *L.Ed.*2d 667, 678–79 (2004); *Wong Sun v. United States,* 371 *U.S.* 471, 83 *S.Ct.* 407, 9 *L.Ed.*2d 441 (1963). In *United States v. Bayer,* 331 *U.S.* 532, 67 *S.Ct.* 1394, 91 *L.Ed.* 1654 (1947), the U.S. Supreme Court explained the cat-out-of-the-bag doctrine in the following way:

[A]fter an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first.

[*Id.* at 540–41, 67 *S.Ct.* at 1398, 91 *L.Ed.* at 1660.]

However, the Court did note that "it has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." *Ibid.*

The meaning and proper application of *Elstad,* however, deeply divided the U.S. Supreme Court in *Seibert, supra,* a case involving a police protocol that instructed officers to withhold *Miranda* warnings "until [an] interrogation has produced a confession." 542 *U.S.* at 604, 124 *S.Ct.* at 2605, 159 *L.Ed.*2d at 650. In *Seibert,* the police officer questioned the defendant, a suspect in an arson-murder investigation, at the station house. *Id.* at 604–05, 124 *S.Ct.* at 2606, 159 *L.Ed.*2d at 650. In accordance with an officially-endorsed stratagem, the officer refrained from advising the defendant of her rights until after she had confessed. *Id.* at 605–06, 124 *S.Ct.* at 2606, 159 *L.Ed.*2d at 650–51. After turning on a tape recorder, he then gave the defendant the *Miranda* warnings, obtained a waiver of her rights, and resumed questioning—confronting her with her earlier admissions to secure a repeat confession. *Ibid.*

A four-member plurality concluded that giving the warnings in the middle of a continuous interrogation, after first extracting a confession, and thereafter covering the same ground to elicit a rehearsed, second confession, "could not effectively comply with *Miranda's* constitutional requirement." *Id.* at 604, 124 *S.Ct.* at 2605, 159 *L.Ed.*2d at 650. Under those circumstances, the plurality suppressed both confessions. *Id.* at 617, 124 *S.Ct.* at 2613, 159 *L.Ed.*2d at 658. The plurality recognized that the very purpose of the "question-first, warn-later" technique "is to render *Miranda* warnings ineffective." *Id.* at 611, 124 *S.Ct.* at 2610, 159 *L.Ed.*2d at 654. The plurality also understood that a suspect "hearing warnings only in the aftermath of interrogation and just after making a confession ... would hardly think he had a genuine right to remain silent." *Id.* at 613, 124 *S.Ct.* at 2611, 159 *L.Ed.*2d at 655–56. That is so because "telling a suspect that 'anything you say can and will be used against you,' without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail." *Id.* at 613, 124 *S.Ct.* at 2611, 159 *L.Ed.*2d at 656.

The overarching issue for the plurality was whether "the *Miranda* warnings given could reasonably be found effective" when they are given after the suspect has confessed without the benefit of the warnings, and the first confession is used to elicit the second confession. *Id.* at 612 n. 4, 124 *S.Ct.* at 2610 n. 4, 159 *L.Ed.*2d at 655 n. 4. Addressing the issue of sequential unwarned and warned confessions, the plurality posed a number of pertinent questions:

> Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda,* or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment. [*Id.* at 611–12, 124 *S.Ct.* at 2610, 159 *L.Ed.*2d at 655.]

In determining "whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object," the Court looked to five relevant factors:

> ▮ the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first.
>
> [*Id.* at 615, 124 *S.Ct.* at 2612, 159 *L.Ed.*2d at 657.]

In light of those factors, the *Seibert* plurality found that a reasonable person in the defendant's situation would not have "understood [the *Miranda* warnings] to convey a message that she retained a choice about continuing to talk," and therefore her "postwarning statements [were] inadmissible." *Id.* at 617, 124 *S.Ct.* at 2613, 159 *L.Ed.*2d at 658.

The plurality distinguished *Seibert* from *Elstad,* noting that in *Elstad* the initial brief questioning without warnings was a "distinct experience" from the later "station house questioning." *Id.* at 615–16, 124 *S.Ct.* at 2612, 159 *L.Ed.*2d at 657. Unlike in *Seibert,* the *Miranda* warnings in *Elstad* could have provided the defendant with a real choice of whether to continue speaking with the police. *Ibid.*

In a concurring opinion, Justice Kennedy supplied the *Seibert* plurality with its fifth vote for suppressing the defendant's post-warning confession. He did so because "the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id.* at 622, 124 *S.Ct.* at 2616, 159 *L.Ed.*2d at 661 (Kennedy, J., concurring). In the "infrequent case" of law enforcement officers purposely withholding *Miranda* warnings to extract a confession as a rehearsal to a warned confession, Justice Kennedy would apply a narrower admissibility standard than the one espoused by the plurality. *See ibid.* In that type of case, he would exclude the post-*Miranda* statement unless curative measures are taken, such as "a substantial break in time and circumstances" from the initial unwarned interrogation or "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." *Ibid.* In the absence of a "deliberate two-step strategy," Justice Kennedy would adhere to the principles of *Elstad. Ibid.*

Writing for four members of the Court, Justice O'Connor dissented, observing that the plurality "devour[ed]" the rationale of *Elstad* by reviving the fruit-of-the-poisonous-tree and cat-out-of-the-bag doctrines in successive interrogation cases. *Id.* at 622, 627, 124 *S.Ct.* at 2616, 2619, 159 *L.Ed.*2d at 662, 665 (O'Connor, J., dissenting). The dissent lamented that the plurality had adopted the view, rejected in *Elstad,* that " 'the coercive impact of the unconstitutionally obtained statement remains, because in a defendant's mind it has sealed his fate[ ]' " and that the impact of the illicitly acquired statement " 'must be dissipated in order to make a subsequent confession admissible.' " *Id.* at 627, 124 *S.Ct.* at 2619, 159 *L.Ed.*2d at 665 (O'Connor, J., dissenting) (quoting *State v. Elstad, supra,* 658 *P.*2d at 554). The dissent dismissed Justice Kennedy's approach as "ill advised" because determining whether a " 'two-step interrogation technique' was 'deliberate' or 'calculated' " requires delving into the state of mind of police officers, an inquiry the Court "normally take[s] pains to avoid." *Id.* at 626–27, 124 *S.Ct.* at 2618–19, 159 *L.Ed.*2d at 664 (O'Connor, J., dissenting).

The *Seibert* opinions have sown confusion in federal and state courts, which have attempted to divine the governing standard that applies in successive interrogation cases involving warned and unwarned confessions. Some courts have followed the plurality opinion.[14] Other courts have taken the position that Justice Kennedy's concurrence represents the holding of the Court.[15] Yet others have decided the admissibility of such confessions under *Miranda* without definitively determining whether the plurality opinion or Justice Kennedy's concurrence represents *Seibert's* holding.[16]

The shifting sands of federal jurisprudence provide no certainty concerning the standard that might apply to the next set of slightly different facts. Judges and police officers, however, must have workable standards to apply to the complex, ever-changing fact patterns that play out in the real world. To give guidance both to courts and law enforcement agencies within our jurisdiction, we have decided to turn to our state law privilege against self-incrimination to decide the issue before us. We have done so in like circumstances before. *See, e.g., State v. Hartley,* 103 *N.J.*

---

[14] *See, e.g., Crawford v. State,* 100 *P.*3d 440, 450 (Alaska Ct.App.2004) (following *Seibert* plurality); *State v. Farris,* 109 *Ohio St.*3d 519, 849 *N.E.*2d 985, 994 (2006) ("We agree with the *Seibert* plurality and dissent that the intent of the officer doing the questioning is not relevant in a *Miranda* analysis."), *cert. denied,* —— *U.S.* ——, 127 *S.Ct.* 1371, 167 *L.Ed.*2d 159 (2007); *Martinez v. State,* 204 *S.W.*3d 914, 918–19 (Tex.App.2006) (concluding that plurality represents holding of *Seibert* ).

[15] *See, e.g., United States v. Kiam,* 432 *F.*3d 524, 532–33 (3d Cir.) (noting that it applied plurality's opinion as narrowed by Justice Kennedy's concurrence), *cert. denied,* 546 *U.S.* 1223, 126 *S.Ct.* 1453, 164 *L.Ed.*2d 149 (2006); *United States v. Naranjo,* 426 *F.*3d 221, 231–32 (3d Cir.2005) (same); *United States v. Aguilar,* 384 *F.*3d 520, 525 (8th Cir.2004) (same).

[16] *See, e.g., United States v. Carrizales–Toledo,* 454 *F.*3d 1142, 1151 (10th Cir.) (declining to determine whether plurality opinion or Kennedy concurrence was holding of *Seibert* ), *cert. denied,* —— *U.S.* ——, 127 *S.Ct.* 692, 166 *L.Ed.*2d 536 (2006); *see also United States v. Rodríguez–Preciado,* 399 *F.*3d 1118, 1141 (9th Cir.2005) (Berzon, J., dissenting) (finding that *Seibert* provides no governing standard).

252, 285–86, 511 *A*.2d 80 (1986); *State v. Deatore,* 70 *N.J.* 100, 112, 358 *A*.2d 163 (1976). It also is fitting that we should do so because we have interpreted our state law privilege to grant broader rights than those available under the Fifth Amendment. *See Reed, supra,* 133 *N.J.* at 251–52, 627 *A*.2d 630 (noting cases in which this Court has accorded greater protection under state privilege than federal courts have interpreted Fifth Amendment to provide); *see also* William J. Brennan, Jr., *The Bill of Rights and the States: The Revival of State Constitutions as Guardians of Individual Rights,* 61 *N.Y.U. L.Rev.* 535, 551 (1986) ("As tempting as it may be to harmonize results under state and national constitutions, our federalism permits state courts to provide greater protection to individual civil rights and liberties if they wish to do so."). Relying on our own developed jurisprudence, infused with persuasive reasoning from *Seibert's* plurality opinion, we next determine whether the two-stage interrogation procedure violated defendant's state law privilege.

## IV.

New Jersey's privilege against self-incrimination is so venerated and deeply rooted in this state's common law that it has been deemed unnecessary to include the privilege in our State Constitution. *Reed, supra,* 133 *N.J.* at 250, 627 *A*.2d 630. The privilege, which has been codified in identical language in both statute, *N.J.S.A.* 2A:84A–19, and evidence rule, *N.J.R.E.* 503, provides that "every natural person has a right to refuse to disclose in an action or to a police officer or other official any matter that will incriminate him or expose him to a penalty or a forfeiture of his estate...." The textual differences between the plain language of our state privilege and the Fifth Amendment suggest that the two privileges do not require similar interpretations or applications. *Compare ibid., with U.S. Const.* amend. V. ("No person ... shall be compelled in any criminal case to be a witness against himself...."). We have treated our state privilege as though it were of constitutional magnitude, finding that it offers broader protec-

tion than its Fifth Amendment federal counterpart. *See State v. Muhammad*, 182 *N.J.* 551, 568, 868 *A.2d* 302 (2005).

We have not hesitated to decide a privilege issue based on state law, rather than on Fifth Amendment grounds, when there is " 'disarray in decisional treatment' " in the federal courts and when "the effective administration of our state criminal-justice system" demands that we give clear guidance to law enforcement officials. *Hartley, supra*, 103 *N.J.* at 284–85, 511 *A.2d* 80 (quoting *Deatore, supra*, 70 *N.J.* at 112, 358 *A.2d* 163). We have acknowledged that in navigating federal law, we may wrongly predict the direction that the United States Supreme Court will take and therefore "principles of sound jurisprudence" may compel us to rest our decision on a state law ground. *Id.* at 284–85, 511 *A.2d* 80. In anticipation of United States Supreme Court pronouncements defining the scope of the Fifth Amendment's protection against compelled self-incrimination, we have issued opinions that ultimately provided broader safeguards under our state law privilege. Thus, for example, unlike the Fifth Amendment, our state law privilege prohibits the prosecution from using a suspect's silence "at or near" the time of his arrest against him. *Deatore, supra*, 70 *N.J.* at 108, 112, 358 *A.2d* 163. *Contra Jenkins v. Anderson*, 447 *U.S.* 231, 238, 100 *S.Ct.* 2124, 2129, 65 *L.Ed.2d* 86, 94–95 (1980) (holding that use of defendant's pre-arrest and pre-*Miranda* silence to impeach his credibility does not violate Fifth Amendment). Moreover, under our state law privilege, we established a bright-line rule mandating, in the case of a suspect who invoked his right to counsel or silence, that the police give new *Miranda* warnings before attempting interrogation again. *Hartley, supra*, 103 *N.J.* at 267, 511 *A.2d* 80. The failure to adhere to that rule requires suppression of any incriminating statement. *Ibid. Contra Michigan v. Mosley*, 423 *U.S.* 96, 104–07, 96 *S.Ct.* 321, 326–28, 46 *L.Ed.2d* 313, 321–23 (1975) (applying totality of circumstances test rather than *per se* rule). We also have relied on our state law privilege when there has been a need to pursue a path consistent with our distinctive state interests that are directly

at odds with federal precedent. *See Reed, supra,* 133 *N.J.* at 248, 253, 627 *A.*2d 630.

Indeed, in applying *Miranda*'s rationale to the jurisprudence of our state law privilege, we have reached different results from the United States Supreme Court's interpretation of *Miranda's* reach. For instance, in *Moran v. Burbine,* 475 *U.S.* 412, 106 *S.Ct.* 1135, 89 *L.Ed.*2d 410 (1986), the police interrogated the defendant about a murder while he was held in custody on burglary charges. The U.S. Supreme Court found that the failure of the police to inform the defendant that a public defender had been retained to represent him and was available to confer with him did not deny the defendant the ability to knowingly and intelligently waive his *Miranda* rights. *Id.* at 421–22, 106 *S.Ct.* at 1141, 89 *L.Ed.*2d at 421.

In *Reed, supra,* we disagreed with the federal high court's conclusion that withholding from a suspect the knowledge that a retained attorney is waiting to speak with him is "irrelevant to the question whether he had knowingly waived his rights." 133 *N.J.* at 248, 269, 627 *A.*2d 630 (citing *Moran, supra,* 475 *U.S.* at 422, 106 *S.Ct.* at 1141, 89 *L.Ed.*2d at 421). We found that knowledge that an attorney is available to confer with the defendant is essential information for a voluntary and intelligent waiver of the state law privilege. *Id.* at 269, 627 *A.*2d 630. Withholding such information, we declared, "renders invalid the suspect's waiver of the privilege against self-incrimination." *Ibid.* We concluded that a defendant's knowledge that his attorney is available to assist him "will surely play an important role in dissipat[ing] the compulsion inherent in custodial interrogation and, in so doing, guard against abridgement of the suspect's right against self-incrimination." *Id.* at 257, 627 *A.*2d 630 (internal quotation omitted). By ordering suppression, we intended to convey a powerful disincentive to law enforcement agents who might attempt to keep a suspect from his attorney and then double their efforts to extract a confession in the attorney's absence. *Id.* at 257–58, 627 *A.*2d 630.

Similarly, in *State v. A.G.D.*, 178 *N.J.* 56, 835 *A.*2d 291 (2003), relying on our state law against self-incrimination, we held that a suspect was deprived of "information indispensable to a knowing and intelligent waiver of [*Miranda*] rights" when interrogating detectives withheld from him the fact that they had in their possession a warrant for his arrest. *Id.* at 68, 835 *A.*2d 291. In that case, a detective obtained a warrant for the defendant's arrest for a sexual crime committed against a child. *Id.* at 59, 835 *A.*2d 291. The detective and a fellow law enforcement officer went to the suspect's home to question him "about allegations of sexual abuse" and then accompanied him to the prosecutor's office. *Ibid.* There, the suspect was given and waived his *Miranda* rights and interrogated without being told of the existence of the arrest warrant. *Id.* at 60, 835 *A.*2d 291. After the suspect gave a highly incriminating written statement, he was placed under arrest. *Ibid.* We suppressed that statement, concluding that "[w]ithout advising the suspect of his true status when he does not otherwise know it, the State cannot sustain its burden to the Court's satisfaction that the suspect has exercised an informed waiver of rights, regardless of other factors that might support his confession's admission." *Id.* at 68, 835 *A.*2d 291.

The principle established in *Reed* and *A.G.D.*—that police officers conducting a custodial interrogation cannot withhold essential information necessary for the exercise of the privilege—is equally applicable here. Detectives Luster and Bava questioned defendant for one hour and thirty-five minutes at police headquarters, extracting damning admissions before they gave defendant the *Miranda* warnings. It was only after defendant implicated himself in the robbery of the cab driver that the detectives told him that he had a right to remain silent, and that if he spoke anything he said could be used against him. The detectives, however, did not advise defendant that his admissions during the earlier interrogation could not be used against him. In those circumstances, it would have been perfectly reasonable for defendant to deduce that he had already incriminated himself and that silence was no longer

an option. *See Seibert, supra,* 542 *U.S.* at 613, 124 *S.Ct.* at 2611, 159 *L.Ed.*2d at 655–56.

The two-step, "question-first, warn-later" interrogation is a technique devised to undermine both the efficacy of *Miranda* and our state law privilege. As in *Reed* and *A.G.D.,* we must set clear standards that will discourage law enforcement agencies from engaging in conduct that will deny a defendant subject to a custodial interrogation a true opportunity to assert his right against self-incrimination.

## V.

### A.

■ Ultimately, the question is whether the belated giving of the *Miranda* rights to a suspect will serve as a firewall between the warned and unwarned statements. Stated differently, the test must be whether in the setting of a two-stage interrogation, the *Miranda* warnings gave the defendant a meaningful opportunity to exercise his rights. In considering the admissibility of a defendant's incriminating statements following unwarned and warned interrogations, the proper standard under New Jersey law focuses on whether a suspect knowingly, voluntarily, and intelligently waived his rights before speaking to the police. *See State v. Presha,* 163 *N.J.* 304, 313, 748 *A.*2d 1108 (2000); *Reed, supra,* 133 *N.J.* at 256–57, 627 *A.*2d 630 (finding that "most practical means to overcome coercion will be through normative rules that apply reasonable, specific, and objective standards"). That approach will avoid the unworkable standard of delving into a police officer's state of mind, and keep the spotlight on the focal issue—whether the defendant properly waived his rights.

■ Therefore, as a matter of state law, we hold that when *Miranda* warnings are given *after* a custodial interrogation has already produced incriminating statements, the admissibility of post-warning statements will turn on whether the warnings functioned effectively in providing the defendant the ability to exercise

his state law privilege against self-incrimination. In making that determination, courts should consider all relevant factors, including: (1) the extent of questioning and the nature of any admissions made by defendant before being informed of his *Miranda* rights; (2) the proximity in time and place between the pre- and post-warning questioning; (3) whether the same law enforcement officers conducted both the unwarned and warned interrogations; (4) whether the officers informed defendant that his pre-warning statements could not be used against him; and (5) the degree to which the post-warning questioning is a continuation of the pre-warning questioning. The factual circumstances in each case will determine the appropriate weight to be accorded to any factor or group of factors.

 Under that formula, however, great weight should be given if the police informed a suspect that his admissions made prior to being given the *Miranda* warnings could not be used against him. Providing that information would strongly suggest that the defendant made any post-warning incriminating statements knowingly, voluntarily, and intelligently. *See Seibert, supra,* 542 *U.S.* at 616, 124 *S.Ct.* at 2612, 159 *L.Ed.*2d at 658. However, the failure to give that instruction will not automatically render the defendant's post-*Miranda* statements inadmissible. *See id.* at 616 n. 7, 124 *S.Ct.* at 2612 n. 7, 159 *L.Ed.*2d at 658 n. 7.

 We emphasize that we are not pronouncing a bright-line rule. For example, if the officers' pre-warning questioning is brief and the defendant's admissions are not incriminating or are barely incriminating and if there is a substantial break in time and circumstances between the pre- and post-warning interrogations, then those factors would militate against suppression of the defendant's statements. Another circumstance that may be considered is the defendant's prior experience with the criminal justice system. In a two-step interrogation case, courts must view the totality of the circumstances in light of the relevant factors and then determine whether the unwarned questioning and admissions

rendered the *Miranda* warnings ineffective in providing a defendant the opportunity to exercise the privilege.

B.

We now apply the relevant factors to this case. Defendant's interrogation began at 3:10 p.m. at Harrison police headquarters and ended at 9:17 p.m. at the Hudson County Prosecutor's office. Throughout those six hours, with few breaks, the same two homicide detectives questioned defendant, even as they transported him from one location to another. The questioning occurred in a police-dominated atmosphere with defendant in custody at both police headquarters and the prosecutor's office.

From the beginning of the interrogation, Detectives Luster and Bava focused on defendant's whereabouts during the time of the Tenezaca shooting. The detectives had information that defendant had a gun at the time of the killing and apparently considered him to be a person of interest in the homicide. For ninety-five minutes they questioned defendant without giving him *Miranda* warnings. During that interrogation, defendant was held in a jail cell and then in the police commander's office. Even defendant's admission that he went to a bar on the evening of the homicide looking to buy marijuana from his friend V did not prompt the detectives to give the warnings.

Only after defendant admitted to playing a role in a scheme to lure a cab driver into a robbery trap did the detectives advise defendant of his *Miranda* rights. By then, one hour and thirty-five minutes into the interrogation, defendant had delivered to the detectives a motive, opportunity, and personal involvement in a crime that the detectives were able to exploit in further questioning defendant. Indeed, at the outset of the first taped statement given by defendant, Detective Bava reminded defendant that they had discussed during the unwarned interrogation "the incident where the cab driver was shot." As in *Seibert, supra,* "it would have been unnatural to refuse to repeat at the second stage what

had been said before." 542 *U.S.* at 617, 124 *S.Ct.* at 2613, 159 *L.Ed.*2d at 658.

Although in giving *Miranda* warnings the detectives told defendant that he had a right to remain silent and that if he did not, anything he said could be used against him, he was not told that his prior incriminating statements could not be admitted against him at trial. *See id.* at 616, 124 *S.Ct.* at 2612–13, 159 *L.Ed.*2d at 657–58 (noting "the probable misimpression" fostered by not telling defendant that earlier "inculpatory statement" could not be used against her). Without such an assurance, defendant might fairly have concluded that it would have been futile to keep silent after having made a damning admission. *See id.* at 616, 124 *S.Ct.* at 2613, 159 *L.Ed.*2d at 658 ("Nothing was said or done to dispel the oddity of warning about legal rights to silence and counsel right after the police had led [the defendant] through a systematic interrogation[.]"). Because the detectives gave *Miranda* warnings midstream and did not mention the inadmissibility of his prior incriminating statements, defendant lacked sufficient information needed to make a knowing, voluntary, and intelligent waiver of the privilege. *See Reed, supra,* 133 *N.J.* at 253, 269, 627 *A.2d* 630.

We reject the Appellate Division's contention that because "the contents of defendant's statements were substantially different and the statements, taken at different times and locations," the unwarned admissions therefore "cannot be objectively viewed as a mere continuation of earlier questions and responses." *O'Neill, supra,* 388 *N.J.Super.* at 148, 906 *A.2d* 495. Defendant's second account, in which he admitted accidentally shooting the cab driver, albeit different from his first account, was part of an unbroken interrogation.

After defendant was first given the *Miranda* warnings at 4:45 p.m., the interrogation proceeded for nearly another five hours with new warnings being administered only one other time, at 5:20 p.m., immediately before the taking of defendant's first taped statement. For our analysis, the critical times are when defendant was given his *Miranda* rights. If defendant did not volun-

tarily, knowingly, and intelligently waive his rights on those occasions, then no evidence resulting from the continuing hours of interrogation can be used against him. *See Miranda, supra,* 384 *U.S.* at 478–79, 86 *S.Ct.* at 1630, 16 *L.Ed.*2d at 726.

■ In the circumstances presented here, considering all of the relevant factors, it is clear that the *Miranda* warnings could not have functioned effectively. The two-step interrogation technique had the likely effect of undermining both defendant's ability to assert his right to remain silent and his ability to knowingly, voluntarily, or intelligently waive that right. Accordingly, all the statements made to Detectives Luster and Bava should have been suppressed in the State's case-in-chief.[17]

■ Given the centrality of defendant's incriminating statements to the prosecution's case—in one statement defendant admitted to a robbery motive and in another to shooting the victim and discarding the weapon—we cannot conclude that the admission of those statements was harmless error, and therefore his convictions must be reversed. *R.* 2:10–2; *see Muhammad, supra,* 182 *N.J.* at 574, 868 *A.*2d 302 (citing *State v. Macon,* 57 *N.J.* 325, 337, 273 *A.*2d 1 (1971)); *see also State v. Sanchez,* 129 *N.J.* 261, 278–79, 609 *A.*2d 400 (1992) (holding "that the admission of [defendant's] confession was not harmless error" because "we are ... uncertain whether the error may have contributed to defendant's conviction").

## VI.

The standard we announce today encourages law-enforcement officers to honor scrupulously the rights of defendants and to not

---

[17] Suppressed statements, however, if found to be "trustworthy and reliable," may be used on cross-examination to impeach a defendant. *See State v. Burris,* 145 *N.J.* 509, 525, 679 *A.*2d 121 (1996). On remand, if defendant chooses to testify, the court should first hold a *Burris* hearing to determine whether defendant can be impeached with his statements to Detectives Luster and Bava. *See id.* at 535, 679 *A.*2d 121.

make end-runs around *Miranda*. *See Hartley, supra,* 103 *N.J.* at 287, 511 *A.*2d 80 (recognizing need to provide clear guidance to law enforcement officers not to refrain from giving *Miranda* warnings). The two-stage interrogation technique is at odds with the basic principles of *Miranda* and our state law privilege. Although suppression of a statement will not automatically follow a "question-first, warn-later" interrogation, this case demonstrates that the risk of suppression should not be worth the gamble for any officer who weighs the high cost of the practice.

*Miranda* rights safeguard New Jersey's privilege against self-incrimination. In this case, the "question-first, warn-later" interrogation undermined *Miranda*'s protections and violated our state law privilege. Because we have concluded that defendant did not knowingly, voluntarily, or intelligently waive his state law right to remain silent, the statements made by defendant while under custodial interrogation by Detectives Luster and Bava cannot be admitted in the State's case-in-chief. We therefore reverse the judgment of the Appellate Division and remand for a new trial consistent with this opinion.

*For reversal and remandment*—Chief Justice RABNER, and Justices LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—6.

*Opposed*—None.