**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4646-17

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

GIVER J. VASQUEZ,

     Defendant-Appellant.

_____

         Submitted September 23, 2020 – Decided August 20, 2021

         Before Judges Fuentes, Whipple and Rose.

         On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 16-01-0083.

         Joseph E. Krakora, Public Defender, attorney for appellant (Jack L. Weinberg, Designated Counsel, on the briefs).

         Gurbir S. Grewal, Attorney General, attorney for respondent (Daniel Finkelstein, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

A Middlesex County Grand Jury returned an indictment against defendant Giver J. Vasquez charging him with the purposeful or knowing murder of Alicia Martinez, N.J.S.A. 2C:11-3(a)(1)(2), second degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b), second degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1), and fourth degree stalking, N.J.S.A. 2C:12-10(b). Defendant was tried before a petit jury over five nonsequential days beginning on September 14, 2017, and ending on October 3, 2017. The jury found defendant guilty of all charges.

On January 18, 2018, the trial judge sentenced defendant to a term of life imprisonment without the possibility of parole on the murder conviction. On March 9, 2018, the judge sua sponte

> reconvened this sentencing hearing because of an error that I made at the original sentencing hearing back in January, wherein I sentenced this defendant on Count [One], a murder charge, to life without parole. And my error was that he did not meet the conditions for life without parole sentence. The max to which I could have sentenced him at that point was life[,] [eighty-five] percent of which he would have to serve without parole, with a five year mandatory period of parole supervision.
>
> And it was only as to that charge. So I've asked everyone to come back, reconvene . . . so that I could correct that error. [T]hough I'm not quite sure I'm erring on the side of caution in giving everyone the opportunity to make whatever extra arguments they

want to make with regards to the sentence in supplement of what they submitted back in January.

Without objection from counsel, the judge resentenced defendant on the murder conviction to life imprisonment with an eighty-five percent period of parole ineligibility and five years of parole supervision, as mandated by the No Early Release Act, N.J.S.A. 2C:43-7.2(a).[1] The amended Judgment of Conviction (JOC) shows the judge merged all of the remaining charges into the sentence imposed for murder, including the second degree unlawful possession of a handgun charge. However, this conviction and the fourth degree stalking charge do not merge with the murder conviction. State v. O'Neill, 193 N.J. 148, 163 n.8 (2007). We thus remand for the trial judge to amend the JOC accordingly.

With respect to the merits of the State's case, defendant does not dispute that on June 24, 2015, he shot and killed Alicia Martinez, a woman with whom he once had a romantic relationship. Indeed, defense counsel made clear to the

---

[1] "Solely for the purpose of calculating the minimum term of parole ineligibility . . . a sentence of life imprisonment shall be deemed to be 75 years." N.J.S.A. 2C:43-7.2(b). Thus, defendant must serve 64.75 years before he is eligible for parole.

jury in his opening statement that defendant killed the victim motivated by jealousy:

> Everybody knows what this term is, and . . . this term is jealousy. Jealousy. I have feelings for someone, and that feeling is then brushed aside by that person for whatever reason there may be. I'm hurt. I'm jealous. How do I react to it? <u>We know the way we should react, but everybody reacts differently</u>.
>
> So, again, I just want you to keep an open mind, please. Listen to the testimony. And, again, like I said, we are not contesting, so it's not going to be like you see on TV who done it? Who done it? Let's look at this, let's look at that.
>
> <u>Giver Vasquez, he shot this young lady in her vehicle. As a result of his actions, she died, there's no question about that, so you can just push that aside</u>.
>
> [(Emphasis added).]

In this appeal, defendant raises several arguments that in no way undermine the viability of his conviction. Mindful of the relevant legal standards of review, we affirm defendant's conviction, but remand for the judge to correct the errors we identified in the JOC. We derive the following facts from the record developed before the trial court.

I.

On the night of June 23, 2015, Rene Gonzalez Rojas picked defendant up in his gray Volkswagen Passat. The two men drove to a liquor store and bought

4

beer. Although Rojas owned the car, he let defendant drive it because he had a driver's license. Later that night defendant stopped the car in front of a house and went inside for approximately ten minutes. Rojas remained in the car to continue a cellphone call. When defendant returned, he had in his possession a revolver and a box of bullets. When the prosecutor asked Rojas if defendant said anything to him "about why he got the gun," Rojas responded: "He said he was going to Mexico." The two men returned to Rojas's residence, where they continued drinking. When Rojas woke up the next day on June 24, 2015, he discovered that defendant had left his residence and his car-keys and vehicle were missing.

That same morning, defendant recorded a video on his cellphone, where he described in detail his intentions to kill the victim:

> Hello family, this is a video that I am recording, I want to tell you that I am saying goodbye. You know what I am like. Something that I never learnt is to forgive betrayal . . . you may be asking yourselves why? I did it because nobody can forgive betrayal. You fall in love; you can forget a person and all but never to forgive a treachery. <u>You can never, ever forgive someone that has betrayed you. You can forgive unfaithfulness, but not betrayal. At least I couldn't. I could never do that. And in this case, it is even worse</u>. The truth is I was never afraid of anything, not afraid to face whatever comes and now I am waiting for. You can imagine who. <u>I want to do it, I don't care if it turns out good or bad</u>. And well, it is what I want to do, if

you know what I mean . . . As the saying goes he who lives by the sword, will perish by the sword.  I don't care.  It will be my choice, I hope you understand.

Please think the body does not have to do with the soul at all.  So, do whatever you want with my body.  The only thing I want you to do is to place some fucking bottles if you want and if you can afford it, or don't do anything please.  That is if I can't make it and if on the contrary I get to Mexico without any problems, I will be safe.  Do you understand me?  I will be fine, so don't worry about me.  If I don't appear in the news saying I was shot or whatever, I will be ok.  I promise you.  So . . . see you soon.  And remember, we were all born to die at last.  Thank you.  Regards and see you.  Do not cry for me please.  Have balls like me.  Kisses. Say goodbye to my mother, to all the family; you know . . . As the saying goes he who lives by the sword, will perish by the sword . . . Hasta la vista baby, as Arnold[2] said.  I am not high you know, a little bit drunk may be, but I know what I am doing and I know how far I can go so . . . please do not cry over me.  Don't be cowards. We were all born, we all die, so that's it. It is over.

[(Emphasis added).]

Around the same time defendant memorialized his macabre intentions, Alicia Martinez was driving to work at Drive Medical in South Brunswick.  By that time, she had definitively severed any romantic relationship she once had with defendant and had been dating a man named Manuel Santiago for

---

[2] We presume this is a reference to an expression uttered by the fictional character known as the "Terminator," played by the actor Arnold Schwarzenegger in a series of dystopian science fiction movies.

approximately three months. The State called Santiago as a witness. He testified that Martinez called him that morning on her way to work in a panic, afraid that someone was following her. The prosecutor followed up on this line of questioning:

Q. Do you know why she was scared?

A. Uh, she just told me that somebody was following her, and someone was texting her, telling her that she was going to die today, and what color shirt she was wearing, and that type of stuff.

. . . .

Q. What did you do after you talked to her?

A. I tried to tell her to calm down because I didn't really know why she was so frantic, you know. I didn't believe, you know, what she was telling me. You know, I thought it was just, you know, who normally knows -- who's going to believe something like that, you know?

So I didn't really pay too much into it, but I waited for her to get to work because, you know, she was scared, so I waited outside.

Q. Did you stay on the phone with her?

A. Yeah, as -- for as long as I could, then she hung up, you know.

Q. Did you, at any point, attempt to try to go find her?

A. No, not at no point.

A-4646-17

Q. And you said you waited in the parking lot[?]

A. Yes.

Santiago testified that a few seconds after Martinez pulled into her parking space located directly in front of the building, a gray car pulled in closely behind her, making it impossible for her to back out of the space. As he described it: "I see a car just zoom in behind her . . . [m]aybe a few seconds . . . it happened very quick. . . ." He saw someone get out of the car that was blocking Martinez, and "heard shots go off . . . when [he] looked, [he] saw that the person had just got back in the car quick, as soon as that happened, and left[.]" At this point, the prosecutor asked Santiago:

Q. Before she got to the parking lot, did she, at any point, say anything about a weapon being involved?

A. Oh, yeah . . . she told me that he showed her a gun. He pulled up next to her, and showed her a gun.

Q. So after you hear the shots, the vehicle that you saw pull up behind her, where does it go?

A. It parked enough where it could still pull out of the other entrance, and go around, and pull out the same way he came in.

Q. And what did you do next?

A. First thing I did was run up to the car, and there I saw Alicia barely breathing.

8

A-4646-17

Patrolman Ryan Bartunek of the Township of South Brunswick Police Department was the first law enforcement agent to respond to the scene of the shooting. When Bartunek approached Martinez's driver's side window, he found her "slumped over" towards the passenger seat without any discernable signs of life. Medical Examiner Dr. Diane Karluk performed the autopsy. She declared Martinez's manner of death a homicide caused by two gunshots to the head.

Ericka Loaiza was decedent's best friend. She brought text messages exchanged by decedent and defendant to the police officers investigating the homicide. Although these electronic messages were written in Spanish, Loaiza translated their content at trial without objection. The texts document a chilling dialogue in which defendant threatens Martinez's life. In one text, Martinez poignantly asked defendant: "Tell me, will you kill me, so I can say goodbye to my mom and dad." Defendant's responses to the victim's text messages are eerily reminiscent of defendant's videorecorded diatribe, in which he explicitly admits to killing Martinez based strictly on his pathological jealousy and wounded machismo pride. One text message contained the following menacing language:

> I will make your wish come true and it will be with the same -- it will be the same way that you bit me. I want to -- I want to finish with everything and block -- and block myself from here. Anyway since the last time, I

9

will be right to you. Go fuck your mom, you fake ass bitch. Don't worry about the video. It will say everything, and this way, you'll be famous.

Independent of these text messages, Loaiza's testimony corroborated defendant's overly possessive behavior during the nearly three-year relationship he had with Martinez. She described their relationship as "crazy," and driven by "so much drama between them." Loaiza also pointed out that Martinez dated other men during the time she was involved with defendant.

Law enforcement agents arrested defendant the day after the shooting in the home of Richard Crosby, an old acquaintance of defendant, located on West Bridge Street, New Hope, Pennsylvania. A pat-down search incident to his arrest revealed defendant had a bullet in his pocket. The arresting officers also found a bag of bullets and a revolver in the bedroom used by defendant. Without objection from defense counsel, the trial judge admitted Middlesex County Prosecutor's Office (MCPO) Detective Andrew Winter as an expert witness in the area of forensic ballistics. Detective Winter testified that the .38 caliber revolver found in defendant's bedroom was operational. He also confirmed that this revolver was the weapon used to kill Martinez.

On the same day as his arrest, defendant was transported to the headquarters of the New Hope Police Department where he was processed and

10

interrogated by MCPO Detective Craig Marchak and Detective Monica Shearer from the South Brunswick Police Department. The interrogation began at 10:15 p.m. The detectives read defendant his constitutional rights under <u>Miranda</u>.[3] He initialed each of the rights as read to him and signed the part in which he voluntarily agreed to waive his rights and speak with the detectives without an attorney present.

However, the record also reveals that defendant expressed some hesitation regarding the waiver of his <u>Miranda</u> rights. This point of possible confusion was captured in the video of the interrogation, as the following exchange between defendant and Detective Marchak shows:

> DETECTIVE MARCHAK: I'm just going to read the remainder of the form to you . . . I waive my Miranda rights. I have been advised of my rights. I understand what my rights are. I will voluntarily speak with you and answer your questions. And if you wish, I'm going to ask you to sign there, date, and then I'll give you the date and time.
>
> DEFENDANT: Do I have to, to answer the question?
>
> DETECTIVE MARCHAK: You don't have to answer any questions. We could, or, at any time you can stop me. You don't have to answer all questions, or anything like that.
>
> DEFENDANT: I don't have to sign it?

---

[3] <u>Miranda v. Arizona</u>, 384 U.S. 436, 467 (1966).

A-4646-17

DETECTIVE MARCHAK: You don't have to sign it.

DEFENDANT: I don't want to sign.

DETECTIVE MARCHAK: You don't want to sign it?
Okay. All right.

. . . .

DETECTIVE MARCHAK: All right then.  Okay.  I'll
be right back.

Detectives Marchak and Shearer stepped out of the interrogation room to permit Marchak to consult with his supervisor.  Marchak returned to the interrogation room about a minute later and addressed defendant as follows:

DETECTIVE MARCHAK: Do you understand your
rights?

DEFENDANT:  Yes.

DETECTIVE MARCHAK: Okay. . . . Is there anything
that you don't understand about them?

DEFENDANT:  The last one.

DETECTIVE MARCHAK:  Which one?  Point it out to
me.  This one?  All right.  I'll explain it to you.
Basically, the first five which (inaudible) that you
initialed, okay, were your <u>Miranda</u> rights.  All right?
That's your rights [sic].  Okay?  That's what you have
before I ask you any questions, okay?  The bottom part
of it is just saying that you have been advised, which
means that I read to you number [one] through [five],
and that you understand them, which, is there any one

12

that you possibly don't understand in that [one] through [five]?

DEFENDANT: No.

DETECTIVE MARCHAK: Okay. So, basically, the first part is advised, which I read these to you. You reviewed them. Second is understanding what my rights are. I, being you, okay, which you say you understand them, and that you will voluntarily speak with me and answer some questions.

DEFENDANT: Okay.

DETECTIVE MARCHAK: Okay? All right. So . . . I'll explain the whole process . . . what you're going to do is, if you agree with the waiver, that you'll sign it . . . me and you can have a conversation. And then I could ask you a couple questions, granted you, again, understand your rights, and that you've been advised, which you say you[] understand . . . I advised you of your rights, I went through your rights. You got a little better understanding of it? All right? And we're going to work like this the whole time, all right?

DEFENDANT: (inaudible)

DETECTIVE MARCHAK: So, then, I'll ask you, since you agree to sign, and we'll work like this the whole time, all right? If you don't understand something, speak up. I'm going to explain it to you.

Defendant signed the Miranda waiver form at 10:24 p.m., approximately nine minutes after the interrogation began. Detective Marchak testified that all interactions he had with defendant, including the time devoted exclusively to

13

the interrogation, was videorecorded. The video of defendant's interrogation was admitted into evidence and played in the courtroom for the jury at trial.

During the interrogation, defendant told the detectives that he decided to kill Martinez the day before the actual shooting. He also acquired the handgun and ammunition on the afternoon of the day before the shooting. Defendant admitted to surreptitiously placing a global positioning satellite (GPS) device on Martinez's car to track her movements. This was how he discovered she was romantically involved with another man.

## II.

Against these facts, defendant raises the following arguments on appeal.

POINT I:

THE COURT ERRED WHEN IT DENIED THE DEFENDANT'S REQUEST FOR SPECIFIC LANGUAGE CONCERNING THE CONTINUING COURSE OF ILL TREATMENT AS PART OF THE CHARGE ON PASSION PROVOCATION MANSLAUGHTER. THE FAILURE TO INCLUDE THIS EXPANDED DEFINITION DEPRIVED THE DEFENDANT OF AN APPROPRIATE CHARGE ON THIS ISSUE AND THEREFORE DEPRIVED THE DEFENDANT OF A FAIR TRIAL.

POINT II:

THE COURT ERRED WHEN IT DENIED THE DEFENDANT'S MOTION TO SUPPRESS THE ADMISSION OF HIS STATEMENT CONFESSING

14

TO THE CRIME. DETECTIVE MARCHAK DID NOT OBTAIN A KNOWING, INTELLIGENT AND VOLUNTARY WAIVER BEFORE PROCEEDING TO TAKE THE DEFENDANT'S STATEMENTS.

POINT III:

THE FAILURE TO CHARGE A LIMITING INSTRUCTION ON THE PROPER USE OF THE TEXT MESSAGES AND THE COMMENTS BY THE VICTIM TO MS. LOAIZA DEPRIVED THE DEFENDANT OF A FAIR TRIAL (NOT RAISED BELOW.)

POINT IV:

THE TRIAL COURT SHOULD HAVE GRANTED THE DEFENDANT'S MOTIONS TO DISMISS THE STALKING CHARGE.

POINT V:

THE COURT DID NOT TAKE INTO CONSIDERATION ALL APPROPRIATE CODE SENTENCING PROVISIONS. THE COURT HAS IMPOSED A SENTENCE THAT SHOCKS THE JUDICIAL [CONSCIENCE].

We discern no legal basis to interfere with the jury's verdict or grounds to support a claim of reversible error by the trial judge. We start by addressing defendant's argument concerning the jury instructions on passion-provocation manslaughter. Defendant argues that the trial judge committed reversible error by refusing to expand the scope of the passion-provocation manslaughter

15                                                          A-4646-17

defense to include: "a continuing course of ill treatment by the decedent against the defendant, or a third person, with whom the defendant stands in close relationship." The trial judge considered and denied defendant's request at the charge conference. We agree with the trial judge's decision.

The Legislature codified the "passion-provocation" defense, N.J.S.A. 2C:11-4(b)(2), to reduce what would otherwise be murder to voluntary manslaughter. The defense applies when "[a] homicide which would otherwise be murder under [N.J.S.A.] 2C:11-3 is committed in the heat of passion resulting from a reasonable provocation." N.J.S.A. 2C:11-4(b)(2). The trial judge correctly denied defendant's request to instruct the jury to consider this defense because the record shows defendant decided to kill his former romantic partner the day before he carried out the homicide.

He surreptitiously placed a GPS device under her car to track her movements. He exchanged chilling text messages with his victim through which he threatened her life. In his videorecorded message to his family, defendant declared his culpability with a sense of pride. He expressed no remorse because he was driven by a homicidal, misogynistic rage to vindicate his wounded pride. The evidence shows defendant viewed Martinez's decision to end her

16

relationship with him not as an act of self-determination, but as an unacceptable act of betrayal that warranted the ultimate punishment.

Furthermore, defendant did not act on an impulse; he methodically stalked his victim as she drove to work. While on the road, he pulled his car parallel to the victim's, took out his handgun, and showed it to her to as a menacing message of what was to come. When the victim reached her destination and stopped at her designated parking space, defendant drove his car directly behind her car to block any attempt to escape. He then stepped out of his car, walked over to where she sat in her car, and shot her twice in the head. Defendant did not kill his victim "in the heat of passion resulting from a reasonable provocation." N.J.S.A. 2C:11-4(b)(2). Passion-provocation manslaughter is not applicable here. See State v. Carrero, 229 N.J. 118, 129-30 (2017). This was a calculated, purposeful, knowing murder.

Defendant also argues that the trial judge erred by denying his motion to suppress his confession because there was insufficient evidence to show, beyond a reasonable doubt, that he knowingly, voluntarily, and intelligently waived his Miranda rights. Defendant also claims that the interrogating officers failed to honor his requests to remain silent. In response, the State argues the record shows that defendant voluntarily, knowingly, and intelligently waived his

Miranda rights. Furthermore, defendant's argument in this respect is legally inconsequential because he does not dispute that he killed the victim. The only issue in contention is his state of mind at the time he took the victim's life. We agree with the State's position. Defendant's argument in this context lacks sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(2).

Defendant next argues that the trial judge erred by denying his motions to dismiss the stalking charge. We disagree. Pursuant to N.J.S.A. 2C:12-10(b), "[a] person is guilty of stalking . . . if he purposefully or knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person to fear for his safety . . . or suffer other emotional distress." A "course of conduct" includes repeatedly threatening, monitoring, and following a person. N.J.S.A. 2C:12-10(a)(1). When evaluating a motion for dismissal made by defendant after the submission of all evidence, our courts must consider not only the evidence presented by the State, but "the entirety of the evidence. . . ." State v. Williams, 218 N.J. 576, 594 (2014).

Here, the record shows defendant placed a GPS tracker on Martinez's vehicle and threatened her with violence on multiple occasions. The trial judge properly denied both motions to dismiss the stalking charge because there was

A-4646-17

sufficient evidence from which the jury could find, beyond a reasonable doubt, that defendant purposefully or knowingly engaged in a course of conduct specifically directed at Martinez, from which a reasonable person under her circumstances would fear for their safety or suffer great emotional distress. Based on this evidence, the trial judge properly denied defendant's motion for a judgment of acquittal under Rule 3:18-2. State v. Fuqua, 234 N.J. 583, 590-91 (2018).

Finally defendant's argument attacking the length of the sentence imposed by the trial judge lacks sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(2). However, as we noted at the start of this opinion, we are compelled to remand the case for the judge to correct the JOC to reflect separate sentences for defendant's conviction for second degree unlawful possession of a handgun and fourth degree stalking. These crimes do not merge with the murder conviction. O'Neill, 193 N.J. at 163 n.8.

Affirmed and remanded to correct the JOC.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4646-17