# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4408-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ANDREAS M. ERAZO,

     Defendant-Appellant.

_____

Argued January 12, 2022 – Decided March 28, 2022

Before Judges Sabatino, Rothstadt, and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 17-10-1376.

Morgan A. Birck, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Morgan A. Birck, of counsel and on the briefs).

Melinda A. Harrigan, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Lori Linskey, Acting Monmouth County Prosecutor, attorney; Melinda A. Harrigan, of counsel and on the brief).

PER CURIAM

After the trial court denied his motion to suppress his statements to police, then eighteen-year-old defendant Andreas M. Erazo pled guilty to the sexual assault and murder of an eleven-year-old girl, his neighbor, A.S.[1]  The court sentenced defendant to an aggregate term of life in prison, subject to a No Early Release Act, (NERA) N.J.S.A. 2C:43-7.2, period of parole ineligibility.

On appeal, defendant challenges the denial of his suppression motion and his sentence, arguing the following specific points:

> POINT I
>
> THE STATEMENT OF DEFENDANT SHOULD HAVE BEEN SUPPRESSED BECAUSE HE DID NOT KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY WAIVE HIS RIGHT AGAINST SELF-INCRIMINATION, NOR WERE THE STATEMENTS KNOWING, INTELLIGENT, OR VOLUNTARY.
>
> A. BECAUSE [DEFENDANT] WAS SUBJECTED TO CUSTODIAL INTERROGATION DURING THE FIRST INTERVIEW, THE FAILURE TO PROVIDE MIRANDA[2] WARNINGS REQUIRES SUPPRESSION OF HIS STATEMENTS.
>
> B. THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT UNDER

---

[1]  Initials are used to protect the identity of the victim, a minor.  R. 1:38-3(c)(9).

[2]  Miranda v. Arizona, 384 U.S. 436 (1966).

A-4408-18

THE TOTALITY OF THE CIRCUMSTANCES, [DEFENDANT'S] WAIVER OF RIGHTS AND SUBSEQUENT STATEMENTS WERE KNOWING, INTELLIGENT, AND VOLUNTARY.

POINT II

THE SENTENCE IS EXCESSIVE AS THE TRIAL COURT RELIED UPON STATEMENTS FROM THE VICTIM'S FAMILY DENIGRATING THE DEFENDANT.

POINT III

THE IMPOSITION OF A LIFE SENTENCE SUBJECT TO NERA WAS CRUEL AND UNUSUAL PUNISHMENT BECAUSE THE COURT IMPOSED IT UPON AN EIGHTEEN-YEAR-OLD OFFENDER IN THE FACE OF SCIENCE THAT COUNSELED STRONGLY AGAINST IMPOSING SUCH A SENTENCE UPON A PERSON OF THAT AGE.

    A. THE CONSTITUTIONAL PROTECTIONS UNDER MILLER[3] SHOULD BE EXTENDED TO DEFENDANT, WHO WAS MERELY EIGHTEEN AT THE TIME OF THE OFFENSE.

    B. IN THE ALTERNATIVE, THE CASE SHOULD BE REMANDED TO APPLY YOUTH AS A NON-STATUTORY MITIGATING FACTOR.

After considering defendant's contentions in light of the record and the applicable principles of law, and for the reasons stated in this opinion, we

---

[3] Miller v. Alabama, 567 U.S. 460 (2012).

reverse the denial of his suppression motion and remand the matter so that an order granting his suppression motion may be entered, and defendant given an opportunity to withdraw his plea and proceed to trial, or otherwise dispose of the matter through a negotiated plea.

I.

We summarize the facts surrounding defendant's statements to police and his arrest as developed at the three-day suppression hearing conducted by the trial court at which the only witness was Detective Wayne Raynor of the Monmouth County Prosecutor's Office.

On July 12, 2017, A.S.'s mother reported to the Keansburg Police Department (KPD) that her daughter was missing. The mother informed responding police officers that she last saw A.S. at about 8:00 p.m. that evening and believed A.S. went to apartment 16-A, the apartment directly above theirs, where defendant lived with his mother and brother. The officers went to that apartment, where defendant, who was home alone, consented to police searching there for A.S. They found nothing and left. The police returned to defendant's apartment at 5:30 a.m., conducted another search with consent, and again found no evidence that the girl was there or had been in the apartment.

4

Later that same morning, Raynor was called in to assist with the investigation. Raynor and other officers canvassed the area surrounding A.S.'s home, and, at about 10:30 a.m., they found her body on a roof beneath a window to defendant's apartment.[4]

Now a homicide case, Raynor was assigned as lead detective, working with Detective Joseph Jankowski from the KPD, and was tasked with interviewing defendant, who agreed to provide a witness statement regarding what he understood was a missing person's investigation. A KPD police officer took defendant in a marked police car to the KPD's nearby station. The car was equipped with recording devices, which were not activated while defendant was escorted by the officers, so it was not known whether defendant was handcuffed at the time or had any conversations with the officer that transported him. Upon his arrival at the station, the officer seated defendant, unrestrained, on a bench in a secured non-public area where the station's holding cell was located and where civilians could not move freely about without an escort.

---

[4] A.S.'s body was found wrapped in a wire and a mattress cover that, according to detectives during defendant's interrogation, defendant's brother identified as originating from defendant's apartment. According to detectives, they learned this information by speaking with defendant's brother between defendant's first and second interviews.

At approximately 10:50 a.m., Raynor and Jankowski introduced themselves and instructed defendant to be patient while they found a place to talk. At no point was defendant told he was free to leave or even to get up to use the facilities or make a phone call. About twenty minutes later, the detectives escorted defendant to an interview room on the second floor, deeper into the secured area. The room was narrower than others and was not equipped with recording devices.

In the interview room, Raynor and Jankowski questioned defendant for nearly an hour and a half, without administering any <u>Miranda</u> warnings, inquiring into defendant's background and whereabouts throughout the day and night A.S. went missing and the morning after. After speaking to defendant, the detectives told defendant they would now arrange to take a written and recorded statement and they were going to leave to find someone to transcribe his statement. Before they left him in the room, they offered food and water, and asked if he needed to use the bathroom, which defendant declined, but he asked if he could leave to smoke a cigarette. The detectives told him to wait in the unlocked interview room.

When Raynor and Jankowski exited the room, they were informed a witness saw A.S. entering defendant's apartment with a person that fit

defendant's appearance on the night she went missing. With this information, Raynor suspected defendant was the perpetrator.

Raynor and Jankowski then escorted defendant from the second-floor interview room, through the secured area, to an outside area, where they remained with him while he smoked a cigarette. Afterward, they escorted him back into the interview room, where he was given a bagel and water and remained for forty minutes, until they escorted him to another interview room that had audio and video recording devices. While defendant waited in this room for several hours for his recorded statement to begin, detectives brought him pizza and water, escorted him to the bathroom and outside to the same area to smoke another cigarette.

About seven hours after defendant first arrived at the station, detectives began taking defendant's recorded statement. Although the detectives at this point no longer considered him as a mere witness; but instead claimed they considered him a person of interest yet treated him as they would a suspect, they did not, at that time, inform defendant of their suspicion, or that A.S.'s body was discovered wrapped in items identified to originate from his home, or that someone had seen a person that fit defendant's description with A.S. going into

7

apartment 16-A the night she went missing, or even that he was giving a statement in what was now a homicide investigation.

Raynor began the second interview by explaining he was about to give defendant <u>Miranda</u> warnings. Specifically, he stated the following:

> RAYNOR: All right, . . . I appreciate it. It's been a long day, but – you've got some water in you, that and a couple cigarette breaks, and here we are.
>
> Listen, we spent a considerable amount of time together, and, you know, you've been very forward with me. You've been very easy to talk to. You and I have spoken to each other today, and it's been a very easy conversation, all right, and I expect that that's where we're going to continue on with this, obviously. But before we do that, <u>because we're in the police department, okay, you're not under arrest, but because we're in a police department</u>, this is a matter obviously we talked about earlier. This is, you know, something that we want to talk to people about. Because we want to talk to you about this I'm going to advise you of your <u>Miranda</u> rights. Okay? All right? We'll get through that. If you have any questions you'll let me know, and then we'll move on from there. Okay?
>
> [(Emphasis added).]

After defendant indicated he understood, Raynor provided <u>Miranda</u> warnings, which defendant acknowledged verbally and in writing, before he waived those rights in the same manner. Raynor advised defendant that what they were about to do was record the statement defendant provided earlier. He

8

told defendant, "what I'd like to do, just literally, is just go over pretty much everything that we talked about earlier today.  Obviously when we spoke earlier.  I wrote down a ton of notes, so I'll just go over and make sure we don't miss anything[.]"

Over the next hour or so, the detectives went over defendant's background[5] and his whereabouts on the day A.S. went missing.  Defendant stated he last saw A.S. on his way out of his apartment at about 1:00 p.m., when he left to go run errands, and provided a timeline of his whereabouts.  Raynor told defendant that what he was now stating "sound[ed] completely different than when [they] spoke earlier," and perhaps defendant was now "over thinking."  Defendant responded by explaining, "It's just the fact that I'm getting -- like, I've been here for hours.  I'm just getting more tired."  In response, Raynor told defendant, "that's why . . . it's important to talk to me."

Turning to his whereabouts the evening A.S. went missing, defendant stated he walked trails alone for several hours before returning home at about

---

[5] Defendant provided his name; familial relationships; living arrangements; his and his mother's history of substance abuse; his history of severe depression and self-harm, including a suicide attempt, which led to being admitted for inpatient treatment at a behavioral health facility specializing in psychiatric and substance abuse treatment, the Division of Youth and Family Services placing him in a group home, which ultimately led to his aunt adopting him.

9:00 p.m., showering, and later being confronted with the officer that first searched his apartment for A.S. After Raynor spent more than an hour of having defendant go over his earlier statement, Raynor asked defendant if he understood "what is going on." Defendant stated "[t]he most [he knew] is that [A.S. was] missing."

In a lengthy response, Raynor told defendant that Raynor was there to help defendant and he explained to him why he did not believe defendant's original explanation of his whereabouts during the initial unrecorded interview. Specifically, Raynor stated the following:

> RAYNOR: Okay. Okay. Well, it's a little bit <u>– it's a little bit worse than that. Okay? It's a little bit worse than that.</u> All right? <u>And my sole function sitting here with you is to give you the tools, . . . to give you the tools to understand that being forthright,</u> you've let Joe and I into your life, you've let us see into your -- under your first layer. Okay? We've kind of got a gist of what a lot of people probably don't know about you. You know what I mean?
>
> . . . . <u>Like I said, my job is to sit here and to help you through this. Okay?</u> I know mistakes happen. I know things happen. I know that you're not a monster. I know that you have had whatever you have had to deal with, but I know that shit happens. Joe and I have done this job long enough to know that just because of the person sitting here and the things that we have is not a direct reflection. All right?
>
> . . . .

A-4408-18

. . . . This is time for you and I and Joe to talk about this. Okay? You're there. All right? You didn't – you didn't come back. You didn't walk the trails for four hours [by] yourself . . . unaccounted for, and come back into the house and take a shower and lay down and go to sleep. All right? The story is clear. But what we'd like to do, come meet us . . . . Talk to us a little bit about this. <u>This is the time to talk to us. Talk to us. Help us explain this. Help us explain.</u>

. . . .

. . . [A]re you familiar with that big camera on the side of the vape shop? All right. So, <u>you not coming back to the apartment, like you said you did,</u> around nine o'clock, that's not concerning to you? All right. I just want to start there. I want to get into a dialogue with this. I want to talk about this with you. You not coming back to the apartment when you told us that you came back means you were there. Okay? Her outside at the time we have her outside, at dusk, okay, means we're not worried about where you were earlier in the day. But we're worried about where you were at that time, at dusk. Okay? <u>This stuff that . . . has led us here to this conversation, it's come from your apartment. Okay? It's come from your apartment.</u>[6] <u>That, coupled with the fact that . . . you can't give us any kind of alibi whatsoever, and what you did, . . . what you did give us, it's not there. It's problematic, obviously.</u> Okay?

. . . .

. . . <u>I want you to come on board with me. I want you to understand the gravity that you're not being judged. You're not being looked at.</u> Things happen. Things

---

[6] We understand the "stuff" Raynor was referring to was the mattress cover and wire that A.S. was found wrapped in.

happen. You're a young man that has been through a lot. And I . . . get that you're not in a good frame of mind. I get that. But I'm not going to sit here and regurgitate everything to you.

But you've got to trust me. I've been forward with you all day. We've been forward with each other. Okay? I'm not lying to you, that – we're back at your apartment. And there's a lot that I want to talk to you about. Okay? If there's some other explanation, well then, . . . let's start talking about it. But we both know what the explanation is. Okay? She was there. She went into your apartment. . . . It's not something that we have to sit and think about. The hardest part right now is for you to understand and to -- to deal with the fact, be able to open your mouth and start talking to me about something that you know is heinous, you know is no good, but you also know that it's a mistake. Okay? You know?

. . . .

You told us two different versions of where you were during the day because the nerves in your chest as I'm sitting here looking at you while you're talking, took you -- you didn't even know what time you got to Wells Fargo. From what you told us earlier today you got to Wells Fargo right after you left your house. You then told us that you were probably there around four or 4:30. That's fine. I'm not worried about that because that's not when all of this is happening. The -- but what that does is you know we're getting close to the time that you can't put yourself anywhere. You can't put yourself anywhere. You won't put yourself anywhere. And what you did tell us, where you did put yourself, we don't see you. You . . . didn't see anybody, you didn't talk to anybody.

12

[DEFENDANT]:  I told you I was on the trail, though.

RAYNOR:  Exactly.  For four hours. And we don't see you coming back when you said you did . . . .

[DEFENDANT]:  I understand that.

. . . .

RAYNOR:  This isn't hard. . . .  This isn't difficult.  All right?  <u>When we have somebody, when we're looking at something like this, and we have somebody, and all indications are pointing to where somebody literally lives, and was home by himself, and that somebody gives us a story that we can't match up.  Not only can't we match it up, we can show that he's not walking back into his apartment at 8:30, nine o'clock.  He's not there.  It means you're in the apartment . . . .</u>  This -- this isn't -- coupled with people who saw -- <u>somebody who saw you and her there</u>.[7]  Coupled with the fact that the items come from your –. . . it's – it's over.  It's a lot.  It's a lot.  That's what you have to understand.  That's what brought us to this very moment.

[(Emphasis added).]

The detectives then assured defendant:  "[t]here's no doubt" it "accidentally happened," "[y]ou're [eighteen] years old," "[y]ou have your entire

---

[7]  Raynor was referring to the witness that saw a person fitting defendant's description with A.S. the night she went missing.  That witness positively identified A.S., but could not make a positive identification of defendant, even after he was showed a photo lineup including defendant's photograph.

A-4408-18

life ahead of you," "[t]his was an awful mistake," "[t]his isn't something you've been planning."

Just before defendant admitted to killing A.S., albeit accidently,[8] defendant had the following exchange with detectives about the recording of what was transpiring in the room they were in and his concern that his mother and girlfriend would see the recording:

> RAYNOR: . . . [T]he only thing that that recording does is show you. Okay?
>
> [DEFENDANT]: So, it's not (indiscernible)?
>
> RAYNOR: No. I mean, it's -- no, I don't mean that literally.
>
> [DEFENDANT]: Oh.
>
> RAYNOR: I mean – don't worry about it. Don't worry about it.
>
> JANKOWSKI: That's fine.
>
> RAYNOR: Figuratively what that camera does is show that Joe and I aren't -- it shows you. <u>It shows you as a human.</u> It shows you as a person.
>
> JANKOWSKI: And you want that. You want -- you want us to -- you want people -- you want us to see that.

---

[8] The video of defendant's statement reflects that at this point defendant was sitting in a chair in a corner of the room with the detectives seated directly in front of him, cornering defendant while he spoke.

A-4408-18

RAYNOR: That's my point. It shows you –

JANKOWSKI: You need to see that.

[DEFENDANT]: Basically -- all right. Why isn't anyone watching it, besides like a police officer? Like, is, like, my mom watching –

. . . .

RAYNOR: Absolutely not. Nobody knows this is happening right now.

[DEFENDANT]: So, I mean, if it's another police officer, whatever, I'd just rather, one, my mother and my girlfriend, obviously, don't see it, hear it, whatever.

RAYNOR: Uh-huh.

After the detectives persuaded defendant that whatever happened could have been an accident, defendant confessed to unintentionally killing A.S., after he suddenly found her in his apartment. Defendant hoped that since the killing was accidental, he would be released to see his soon to be born baby grow up.

Later during the interview, Raynor told defendant that A.S. was not wearing pants or underpants when police found her body, which usually meant that something sexual had occurred. In response, defendant denied recalling that anything sexual happened, although he confirmed, in response to Raynor's suggestion, that he could not remember because he may have blacked out.

15

The interview ended after about five hours when, in response to the detectives' request for a DNA sample, defendant asked to speak to a lawyer. The detectives ended the interview, arrested defendant, and charged him with the murder of A.S. and possession of a weapon for an unlawful purpose.

On July 17, 2017, a Monmouth County Grand Jury returned an indictment charging defendant with murder, N.J.S.A. 2C:11-3(a)(1) (Count one); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3) (Count two); three counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1), (4), and (3) (Counts three, four, and five respectively); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (Count six); and third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d) (Count seven).

As already noted, the trial court conducted a three-day hearing before denying defendant's motion to suppress his statements to the detectives. The court placed its reasons on the record on April 27, 2018, and entered its order the same day.

As explained in its oral decision, the court determined "[t]he record, in sum, does not indicate by any objective criteria that defendant was in custody at any time prior to and in the course of his first interview with detectives." The court relied on its findings that defendant was transported by police in a police

car to the KPD headquarters; no evidence was presented to indicate defendant was ordered into the car or was restrained therein; when defendant arrived at the police station, he was escorted to a secured common area, where other witnesses were seated and waited to be interviewed; defendant was not restrained on the bench where he sat waiting or after he was escorted to the interview room during the near hour and a half interview.

The court further determined <u>Miranda</u> warnings were not required because defendant was not subject to an interrogation. It reasoned "detectives did not consider defendant to be a suspect and instead were only questioning him as a potential witness." The court stated that "[q]uestioning by law enforcement officers that is part of an investigation and does not target a specific individual is not interrogation for <u>Miranda</u> purposes."

Turning to the second interview, the court determined the State proved beyond a reasonable doubt defendant's waiver of his Fifth Amendment rights and subsequent statements were given knowingly, intelligently, and voluntarily. First, it determined the two-step interview was not the question first, warn later practice, discussed in <u>State v. O'Neill</u>, 193 N.J. 148 (2007), that would taint a later waiver of rights. The judge cited to the initial interview being short; that it took place in a different room; occurred about five hours before the second

interview; and, it considered most importantly, defendant's statements were not incriminating. Ultimately, the court determined the totality of the circumstances showed defendant's waiver was proper.

Those circumstances included, as the trial court determined, facts "militating in favor of a finding of involuntariness of defendant's statement," such as defendant was eighteen years old, had not yet finished high school, and was subjected to a prolonged interview. They also included facts demonstrating defendant waived his rights, knowingly, intelligently, and voluntarily, such as (1) defendant was given and "signed a document evidencing that he understood [his Miranda] rights and wished to give them up;" (2) nothing from the record indicated defendant did not understand his rights or waiver; (3) he was provided with multiple meals and bathroom and cigarette breaks; and (4) neither the video or transcript demonstrate that he was physically or mentally exhausted or impaired, or that "detectives used any sort of physical or mental coercion to induce defendant to waive his rights" where defendant did not ask for a break or stop the interrogation when defendant said he was "getting more tired" in response to inconsistencies in his recounting of his whereabouts, but instead Raynor's tone and attitude was "almost paternalistic," and defendant "almost never adopted a defensive posture."

18

After the denial of his motion, on February 26, 2019, defendant pled guilty, pursuant to a plea agreement, to murder and aggravated sexual assault of a victim under thirteen years of age.  At his plea hearing, defendant admitted to committing an act of sexual assault against A.S. through "sexual penetration" and intentionally causing her death by stabbing her neck.

On May 31, 2019, the court sentenced defendant on count one to life imprisonment, subject to NERA and to a concurrent fifty years on count three. The court then dismissed the remaining counts in response to the State's motion, as contemplated by the plea agreement.  This appeal followed.

## II.

On appeal, defendant contends the State failed to prove beyond a reasonable doubt that his statements to detectives were provided knowingly, willingly, and voluntarily because he was "subjected to [a] custodial interrogation during his first interview" without being "informed of his Miranda rights," which "undermined his later waiver of his rights."  Specifically, he argues he was in custody as demonstrated by the facts that he was driven to the police department in a police car and had no other way to get home, he was not told he was free to leave, and he had to ask permission and receive an escort to use the bathroom and to go outside to smoke a cigarette.  Under these

19

circumstances, he contends a reasonable person in his position would not have believed he was free to leave.

Defendant further contends that, at the time of the first interview, he was interrogated after A.S.'s mother had already told officers she believed A.S. was in defendant's apartment when she went missing; his apartment was searched twice; A.S.'s body was found directly below his apartment window; and detectives questioned him for an hour and twenty minutes, without disclosing that information.

Defendant also argues his statements from his second interview must be suppressed because the detectives conducted a two-step interview where detectives "questioned first" and "warned later," invalidating his Miranda waiver. He supports this argument by highlighting that the same detectives, just a few hours after the first interview, asked the same questions as the first interview, did not inform him his pre-warning statements could not be used against him, and withheld from him his status as a suspect. Also, they told him the Miranda warnings were being provided only because they were in a police department, no one was watching the recording at that time, the video was being taken only to show him "as a human," and it was their job to help defendant. He contends these statements implied to defendant that the video could serve only

to help him, and his statements would not be used against him. Moreover, these statements induced defendant's incriminating statements, evidenced by his reluctance to speak until he was reassured no one was watching; and stating to detectives, "I want to be able to be there when my baby is born, watching it grow up." Additionally, defendant claims he was more vulnerable to compulsion, despite having one prior juvenile adjudication, because he was only eighteen years-old, did not finish high school, had been removed from his mother's care when he was thirteen, and he suffered from untreated bipolar disorder. We find merit to these contentions.

A.

Our review of a trial court's findings at an evidentiary hearing or trial is deferential. See State v. Tillery, 238 N.J. 293, 314 (2019); State v. Hubbard, 222 N.J. 249, 262-65 (2015). "[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Carrion, 249 N.J. 253, 279 (2021) (alteration in original) (quoting State v. Elders, 192 N.J. 224, 243 (2007) (holding that a defendant's second statement to police given after Miranda warnings should have been suppressed when he made his first incriminating statement after he was

confronted with an implied threat his children would be removed from his care and he was not informed his pre-warning statements could not be used against him)). However, "the interpretation of law 'and the consequences that flow from established facts' are not entitled to deference and are reviewed de novo." Ibid. (quoting Hubbard, 222 N.J. at 263).

Nevertheless, "[w]hen faced with a [challenge to a] trial court's admission of police-obtained statements, [we] engage in a 'searching and critical' review of the record to ensure protection of a defendant's constitutional rights." State v. Hreha, 217 N.J. 368, 381-82 (2014) (quoting State v. Pickles, 46 N.J. 542, 577 (1966)). "Subject to that caveat, [we] generally will defer to a trial court's factual findings concerning the voluntariness of a confession that are based on sufficient credible evidence in the record." State v. L.H., 239 N.J. 22, 47 (2019). This deference extends to a court's determinations based not only on live testimony but also when based on the review of video or documentary evidence because of the court's "expertise in fulfilling the role of factfinder." State v. S.S., 229 N.J. 360, 379-80 (2017).

Our deference requires that we not reject a trial court's factual findings merely because we "disagree[] with the inferences drawn and the evidence accepted by the trial court or because [we] would have reached a different

conclusion." Id. at 374. Only if the court's factual findings are "so clearly mistaken 'that the interests of justice demand intervention and correction,'" will we discard those factual findings. State v. Gamble, 218 N.J. 412, 425 (2014) (quoting Elders, 192 N.J. at 244). When the court's factual findings are "not supported by sufficient credible evidence in the record," our deference ends. S.S., 229 N.J. at 361.

B.

We begin our review by observing any consideration of the admissibility of a defendant's statements to police necessarily invokes concern about a violation of a defendant's "right against self-incrimination," which is "[o]ne of the most fundamental rights protected by both the Federal Constitution and state law," and the voluntariness of the waiver of that right. Carrion, 249 N.J. at 274-75. "The right against self-incrimination . . . guaranteed by the Fifth Amendment to the United States Constitution and this state's common law[ is] now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." State v. Diaz, __ N.J. Super. __, __ (App. Div. 2022) (slip op. at 19) (quoting S.S., 229 N.J. at 381-82). The importance of that right cannot be overstated. As Justice Albin stated in L.H., "[n]o piece of evidence may have greater sway over a jury than a defendant's confession. For that reason, it is of critical importance

that law enforcement officers use interrogation techniques that will elicit confessions by lawful means." 239 N.J. at 27.

"In Miranda, the United States Supreme Court 'determined that a custodial interrogation by law enforcement officers is inherently coercive, automatically triggering the Fifth Amendment privilege against self-incrimination.'" Diaz, __ N.J. Super. at __ (slip op. at 19-20) (quoting State v. P.Z., 152 N.J. 86, 102 (1997) (holding that police officers' misleading defendant as to the reason for his arrest and subsequent questioning warranted suppression of his statements)). "[T]he Supreme Court put safeguards in place to protect the privilege against self-incrimination and respond to the 'inherently compelling pressures which work to undermine the individual's will to resist and to compel [an individual subject to custodial interrogation] to speak where he would not otherwise do so freely.'" Carrion, 249 N.J. at 275 (second alteration in original) (quoting Miranda, 384 U.S. at 467 (requiring that an "accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored")).

To safeguard a suspect's Fifth Amendment right against self-incrimination, "[a] confession or incriminating statement obtained during a custodial interrogation may not be admitted in evidence unless a defendant has

been advised of his or her constitutional rights." Ibid. (quoting Hubbard, 222 N.J. at 265). "[T]he failure by police interrogators to deliver any of the required warnings/advisements automatically results in the suppression of an ensuing statement." Diaz, __ N.J. Super. at __ (slip op. at 25) (citing State v. Carty, 170 N.J. 632, 649 (2002)). And, even when properly advised, "a person must be told that he [or she] can exercise his [or her] rights at any time during the interrogation." Id. at __ (slip op. at 20) (alterations in original) (quoting Tillery, 238 N.J. at 315).

In the context of Miranda issues, the term "custodial interrogation" is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Hubbard, 222 N.J. at 265-66 (quoting Miranda, 384 U.S. at 444). "[I]f the questioning is simply part of an investigation and is not targeted at the individual because she or he is a suspect, the rights provided by Miranda are not implicated." Id. at 266 (quoting State v. Timmendequas, 161 N.J. 515, 614-15 (1999)). However, "express questioning" or "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response," rises to an interrogation. Id. at 267 (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)). Essentially, "Miranda turns

on the potentially inquisitorial nature of police questioning." Id. at 266. For that reason, the Court in O'Neill found that questions about an interrogee's whereabouts at the time and place a crime occurred was considered interrogation and not a "casual chat." O'Neill, 193 N.J. at 169. Questions about an interrogee's "movements" on the day of the incident are not mere "attempts to secure information that [might] assist[]" police, but rather are "target questions that reflect a clear attempt . . . to cause [an interrogee] to incriminate himself." Hubbard, 222 N.J. at 271-72.

As for physical custody, federal law requires a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted). In New Jersey, "[o]ur courts have also recognized that custody in the Miranda sense does not necessitate a formal arrest, nor does it require physical restraint in a police station, nor the application of handcuffs, and may occur in a suspect's home or a public place other than a police station." P.Z., 152 N.J. at 102-03 (internal quotation marks omitted).

"Whether a suspect has been placed in custody is fact-sensitive and sometimes not easily discernable." State v. Scott, 171 N.J. 343, 364 (2002). "The relevant inquiry is determined objectively, based on 'how a reasonable

[person] in the suspect's position would have understood his situation,'" rather than "on the subjective views harbored by either the interrogating officers or the person being questioned." Hubbard, 222 N.J. at 267 (alteration in original) (first quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984); and then quoting Stansbury v. California, 511 U.S. 318, 323 (1994)). Indeed, "[t]he critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors." P.Z., 152 N.J. at 103; see State v. Smith, 374 N.J. Super. 425, 431 (App. Div. 2005) (delineating relevant factors in evaluating custody as "the time, place[,] and duration of the detention; the physical surroundings; the nature and degree of the pressure applied to detain the individual; language used by the officer; and objective indications that the person questioned is a suspect").

In cases where, as here, an interrogee is questioned twice, the first time without any Miranda warnings, courts are required to consider all relevant factors, including those the New Jersey Supreme Court enumerated in O'Neill, "to assess how effectively the warnings in the second interrogation functioned[.]" Carrion, 249 N.J. at 276-77 (quoting O'Neill, 193 N.J. at 180-

A-4408-18

81).  The court cautioned, however, "that no single factor is determinative."  Id.

at 276.

The O'Neill factors include the following:

> (1) the extent of questioning and the nature of any admissions made by defendant before being informed of his Miranda rights; (2) the proximity in time and place between the pre- and post-warning questioning; (3) whether the same law enforcement officers conducted both the unwarned and warned interrogations; (4) whether the officers informed defendant that his pre-warning statements could not be used against him; and (5) the degree to which the post-warning questioning is a continuation of the pre-warning questioning.  The factual circumstances in each case will determine the appropriate weight to be accorded to any factor or group of factors.
>
> [Ibid. (quoting O'Neill, 193 N.J. at 180-81).]

A defendant may waive his Fifth Amendment rights so long as his waiver

"is made voluntarily, knowingly, and intelligently."  Id. at 275 (quoting

Miranda, 384 U.S. at 444).  Before a defendant's custodial statement may be

admissible, the State must "prove beyond a reasonable doubt that the suspect's

waiver [of rights] was knowing, intelligent, and voluntary."  Ibid. (quoting

Tillery, 238 N.J. at 316).  In other words, at a hearing to determine the

voluntariness of a defendant's statement, "the State bears the burden of proving

beyond a reasonable doubt that a defendant's confession is voluntary and not

resultant from actions by law enforcement officers that overbore the will of a defendant." Hubbard, 222 N.J. at 267. "The State bears a similarly high burden when a defendant challenges a statement procured by a law enforcement officer without the benefit of Miranda warnings." Ibid.

When determining whether the State has satisfied its burden that a waiver was knowing, intelligent and voluntary, a court must consider the "totality of the circumstances," which includes factors such as the defendant's "age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved." State v. A.M., 237 N.J. 384, 397 (2019). Additionally, a court may consider the defendant's "previous encounters with law enforcement, and the period of time between 'administration of the [Miranda] warnings and the volunteered statement.'" State v. Knight, 183 N.J. 449, 463 (2005) (alteration in original) (quoting Timmendequas, 161 N.J. at 614).

The focus of a Miranda analysis should be on whether the defendant had a clear understanding and comprehension of his or her Miranda rights based on the totality of the circumstances. State v. Puryear, 441 N.J. Super. 280, 297 (App. Div. 2015) (citing State v. Nyhammer, 197 N.J. 383, 402 (2009)

(affirming trial court's admission of defendant's incriminating statements to police despite being initially interviewed regarding a crime allegedly committed by relative because, unlike O'Neill, detectives provided defendant with Miranda warnings before questioning him about anything and defendant testified he knew he "had a right to refuse to answer any questions," even after detectives revealed the allegation against him)).

"Where the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." Tillery, 238 N.J. at 316 (quoting Berghuis v. Thompkins, 560 U.S. 370, 384 (2010)). However, a defendant signing a waiver of his rights, which were read to him prior to being questioned, cannot be accepted as evidence of a waiver where the interrogating officer "minimize[s] the significance of the suspect's signature on that card or form." Id. at 319 (concluding that a defendant's signature to a waiver form that only acknowledged his rights were read to him did not establish a waiver of his rights).

For example, in State ex rel. A.S., the Court held an "interrogating officer violated a juvenile defendant's rights by telling her that answering questions 'would actually benefit her'—an assertion at direct odds with the Miranda

warning 'that anything she said in the interview could be used against her in a court of law.'" L.H., 239 N.J. at 44 (quoting State ex rel. A.S., 203 N.J. 131, 151 (2010)).  Similarly, in our opinion in Puryear, we held defendant's ensuing statement inadmissible where the interrogating officer neutralized the Miranda warning by representing to defendant, "The only thing you can possibly do here is help yourself out.  You cannot get yourself in any more trouble than you're already in.  You can only help yourself out here."  441 N.J. Super. at 288, 298-99.

As we observed in Puryear, "[a] police officer cannot directly contradict, out of one side of his mouth, the Miranda warnings just given out of the other." Id. at 296-97 (first quoting State v. Pillar, 359 N.J. Super. 249, 268 (App. Div. 2003); then citing United States v. Ramirez, 991 F. Supp. 2d 1258, 1269-70 (S.D. Fla. 2014) (telling a defendant if he or she did not answer questions "it would be worse" contradicted the Miranda safeguards)).  The courts in Puryear and A.S. both held the defendants' statements inadmissible because the interrogating officers had contradicted the Miranda warnings by misleading the defendants into believing their statements would help them and would not be used against them.  Id. at 298-99; A.S., 203 N.J. at 151 (holding the detective

telling the defendant that answering his questions would show that the defendant was a "good person" contradicted the <u>Miranda</u> warnings).

Also, "[a] court may conclude that a defendant's confession was involuntary if interrogating officers extended a promise so enticing as to induce that confession." <u>L.H.</u>, 239 N.J. at 45 (quoting <u>Hreha</u>, 217 N.J. at 383). "[W]here a promise is likely to 'strip[] defendant of his "capacity for self-determination"' and actually induce the incriminating statement, it is not voluntary." <u>Ibid.</u> (quoting <u>State v. Fletcher</u>, 380 N.J. Super. 80, 89 (App. Div. 2005)). However, in <u>Pillar</u>, where a defendant admitted to a crime based on the interrogating officer's assurance that their conversation was off the record, we observed that "a misrepresentation by police does not render a confession or waiver involuntary unless the misrepresentation actually induced the confession." 359 N.J. Super. at 269 (quoting <u>State v. Cooper</u>, 151 N.J. 326, 355 (1997)). Such inducing misrepresentations include, as already noted, misrepresentations about a defendant's true status which induced a confession or even seemingly exculpatory statements, especially when given without the benefit of <u>Miranda</u>. <u>See</u> <u>Diaz</u>, __ N.J. Super at __ (slip op. at 37); <u>Nyhammer</u>, 197 N.J. at 402; <u>Miranda</u>, 384 U.S. at 476.

As Justice Albin also explained in <u>L.H.</u>, while certain lies told by interrogating officers are tolerated, inducements to speak to law enforcement that include express or implied assurances of leniency cannot be tolerated. Specifically, he stated the following:

> Because a suspect will have a natural reluctance to furnish details implicating himself in a crime, an interrogating officer may attempt to dissipate this reluctance and persuade the suspect to talk. One permissible way is by appealing to the suspect's sense of decency and urging him to tell the truth for his own sake. Our jurisprudence even gives officers leeway to tell some lies during an interrogation.
>
> Certain lies, however, may have the capacity to overbear a suspect's will and to render a confession involuntary. Thus, a police officer cannot directly or by implication tell a suspect that his statements will not be used against him because to do so is in clear contravention of the <u>Miranda</u> warnings. . . .
>
> Other impermissible lies are false promises of leniency that, under the totality of circumstances, have the capacity to overbear a suspect's will. <u>A free and voluntary confession is not one</u> . . . <u>obtained by any direct or implied promises, however slight</u>, nor by the exertion of any improper influence.
>
> . . . .
>
> Under the totality-of-the-circumstances test, a promise of leniency is one factor to be considered in determining voluntariness. Courts have recognized that the danger posed by promises of leniency is that such promises in some cases may have the capacity to

overbear a suspect's will and produce unreliable— even false—confessions. Some courts also take into account an interrogator's "minimization" of the offense when questioning the suspect as one factor in determining the voluntariness of a confession.

[L.H., 239 N.J. at 43-46 (internal quotation marks, alterations, and citations omitted).]

However, these limitations do not prevent police from employing "certain forms of trickery while posing substantive questions following a knowing and voluntary Miranda waiver." Diaz, __ N.J. Super. at __ (slip op. at 37). As we explained in Diaz,

Such [permitted] trickery is designed to induce an interrogee who has already waived his or her Miranda rights to make factual statements that constitute incriminating admissions. We are aware of no precedent, however, that authorizes trickery as part of the waiver process, that is, trickery designed to induce a person to yield his or her right to remain silent and consult with an attorney before answering substantive questions. Indeed, Miranda itself explains to the contrary that "any evidence that the accused was . . . tricked . . . into a waiver will, of course, show that the defendant did not voluntarily waive his [or her] privilege."

[Ibid. (second alteration in original) (quoting Miranda, 384 U.S. at 476).]

A-4408-18

## C.

With these guiding principles in mind, we turn to the totality of the circumstances presented in this matter and conclude that the entirety of both of defendant's statements to police should have been suppressed. The detectives here conducted two custodial interrogations, the second being a repetition and continuation of the first, knowingly withheld defendant's "true status" from him before administering any warnings, exploited the information from the first to extract a confession in the second, undermined the <u>Miranda</u> warnings they eventually gave him by minimizing their significance by telling him they were there to help him and that the video of his statement was to benefit defendant and would not be seen by others. Moreover, under the totality of the circumstances, the custodial interrogations were not supported by evidence that defendant knowingly, intelligently, and voluntarily waived his <u>Miranda</u> rights.

First, the trial court's determination that the first interview was not a custodial interrogation is not supported by the evidence. The evidence established that an eighteen-year-old boy was taken in the backseat of a marked police vehicle to a stationhouse, with no apparent means of returning home or even being told he could leave to go home or elsewhere, and was placed in an area where he was not allowed to move about freely, including getting up and

leaving if he chose to do so because anyone seeking to move about had to be escorted.

Additionally, detectives' questioning was not "simply part of an investigation" because they targeted defendant as a suspect and performed an inquisition specifically and deeply into his background and activity from the night before A.S. went missing to the day after. See Hubbard, 222 N.J. 266. As the interrogation was custodial, it required the administration of Miranda warnings. This requirement was punctuated when defendant was taken for questioning further into the recesses of the stationhouse, on the second floor, where he was told to wait in the room for the detectives and, when he wanted to take a cigarette or bathroom break, he had to be escorted. The same restraints applied during the second interview. There was nothing noncustodial about either interview. Under these circumstances, no reasonable person would have thought at any time they were free to leave. Rather, it was clear that his or her liberty was restrained.

The failure to administer Miranda warnings before the first custodial interrogation was not remedied by the warnings given before the second because the warnings and gravity of the offense in question were minimized and

defendant had already provided information that was used against him to extract a confession.

Raynor telling defendant immediately prior to administering the warnings that he had to provide them only because they were in a police station clearly "minimize[d] the significance of" defendant's waiver, Tillery, 238 N.J. at 316; L.H., 239 N.J. at 43-46, especially when considering defendant's age, lack of a high school education, minimal lack of experience with the criminal justice system, and his mental health issues, as well as the many hours he already spent secure inside the police station. Specifically, prior to administering the warnings, Raynor learned from the first interview[9] that defendant was only a teenager and suffered from mental health issues for which he would self-medicate and self-harm, including attempting suicide.[10]

Further undermining the Miranda warnings was the detectives' comment during the second interview about their roles, telling defendant that it was the detectives' job to "sit here and to help you through this" and that defendant was

---

[9] Although we do not have a recording of the first interrogation, detectives framed the second interview as "literally" just going over what they had gone over in the morning and the State conceded the first hour and a half or so of the second interrogation is largely the same as the entirety of the first.

[10] Later, after he began his confession, defendant told detectives he was not currently taking his prescribed medication.

A-4408-18

"not being judged. . . . not being looked at," and that the video of his statement was for his benefit. The detectives' conduct here not only undermined the Miranda warnings but also "[a]ffirmatively mislead[ defendant] about the seriousness of the offense for which he . . . was taken into custody[, which] strikes at the heart of [his] waiver decision." Diaz, __ N.J. Super. at __ (slip op. at 37-38); see also L.H., 239 N.J. at 43-46.

Preliminarily, the trial court misunderstood or overlooked our jurisprudence establishing defendant's seemingly exculpatory statements as inculpatory in nature. During the first interview, it was undisputed that defendant gave a detailed explanation as to his alleged location during the day and evening when A.S. was reported missing. The trial court overlooked that these seemingly exculpatory statements as actually inculpatory in nature. The detectives later used the inconsistencies in defendant's explanation during their second interview to impeach defendant and demonstrate his guilt through implication, which they could not have done had they not conducted the first interview. Such conduct is not condoned where Miranda warnings have not been given before the initial interview because "statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus

to prove guilt by implication." State v. Ahmad, 246 N.J. 592, 615 (2021). "These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement." Ibid. (holding that trial court erred admitting defendant's unwarned statement to police where "the State used defendant's recorded statement to demonstrate that defendant told untruths to detectives when he was questioned").

Also, suppression of defendant's first statement was warranted because "the detectives were able to exploit in further questioning defendant" the information they secured during the first interview, supported the suppression of both his statements. O'Neill, 193 N.J. at 182. As already noted, the detectives asked about defendant's whereabouts on the day A.S. went missing and then pinned defendant against his initial recounting of events when they interrogated him again to extract a confession. When they had him repeat his statement in the next interview and he mixed up the events of that day, detectives confronted him with the inconsistencies, visibly agitating "the nerves in [his] chest." Then, they used the inconsistencies and the unverifiable nature of some of his statement to pressure him into giving a different statement.

We also note, just as the trial court found, there is no record of what transpired between the officers who transported defendant to the KPD stationhouse and defendant, including whether he was handcuffed or otherwise restrained, other than what Raynor surmised without first-hand knowledge. What is clear, however, is that when defendant was asked to give a statement to police, he understood it was a witness statement in connection with a missing persons investigation, even though the police already discovered A.S.'s body underneath defendant's window and A.S.'s mother had told police she understood her daughter went to defendant's apartment.

At the time of the first interview, there was no question that the investigation was no longer a missing person investigation and despite that fact, the interrogating officers told defendant he was not under arrest, and only revealed deep into the second interview the reason for their interrogation was "it's a little bit worse than" inquiring about a missing person. They did so knowing that defendant was their prime suspect, if not before the first interview, certainly before they questioned him a second time, when they knew that a witness had seen the victim with a person detectives believed to be defendant the evening she went missing and that the material the victim was discovered wrapped in originated from defendant's apartment.

A-4408-18

Throughout the process, therefore, defendant was never informed of his status and instead affirmatively misled to believe he was providing a witness statement in a missing person investigation. In fact, he was never told the police were investigating a homicide. "[T]he impact of the police decision in this instance to [not] advise defendant of the reason for his [questioning except] in a manner that was vague and misleading" prevented defendant from making a voluntary and knowing waiver of his right to remain silent before the first interview when no warnings were given, and the later interview, when he ostensibly waived his right. Diaz, __ N.J. Super. at __ (slip op. at 49).

There is no dispute that the detectives knew at the time of defendant's initial interrogation, and even more before his second, facts that when viewed "from the standpoint of an objectively reasonable police officer," gave rise to probable cause that defendant killed A.S. Id. at __ (slip op. at 48) (quoting State v. Gibson, 218 N.J. 277, 293 (2014)). "Probable cause exists where the facts and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a [person] of reasonable caution in the belief that an offense has been or is being committed." Id. at __ (slip op. at 43) (quoting State v. Moore, 181 N.J. 40, 46 (2004)).

Here, the detectives' knowledge established probable cause, and therefore the need to inform defendant of his true status. The information known to the detectives included "the incriminating evidence that was presented to defendant during the [second] stationhouse examination." Id. at __ (slip op. at 44). It included that the facts about which defendant told them during the first interview were belied by a convenience store video, which was not produced at the suppression hearing, and a witness seeing A.S. with a person detectives believed was defendant go in the apartment building together. "[T]he failure to mention [A.S.'s] death and defendant's potential exposure to a first-degree . . . sentence . . . was designed or reasonably likely to convey to defendant that he was facing a significantly less serious [situation] than he actually faced." Id. at __ (slip op. at 40).

## D.

Also, applying as we must, the unexhaustive list of O'Neill factors, we conclude that the second interview was not sufficiently attenuated from the first, compounding the ineffectiveness of the Miranda warnings given only in the second interview.

At the outset and significantly, the trial court bypassed factor four in its analysis, which our Court "gives 'great weight'" to and is evident here—

42

detectives did not inform defendant his prior unwarned statement could not be used against him before he waived <u>Miranda</u> rights and provided a second statement. <u>See</u> <u>Carrion</u>, 249 N.J. at 278. Equally clear and bypassed by the court is factor three, the same detectives conducted both the unwarned and warned interrogations, and factor five, the post-warning questioning was a continuation of pre-warning questioning to such a degree that they completely overlapped before detectives resumed where they left off. As in <u>O'Neill</u>, "it would have been unnatural to refuse to repeat at the second stage what had been said before." <u>See</u> <u>O'Neill</u>, 193 N.J. at 182-83. Therefore, these three factors favor suppression.

As for factor two, we consider "the proximity in time and place between the pre-and post-warning questioning." <u>O'Neill</u>, 193 N.J. at 180-81. We are constrained to accept the trial courts determination that five hours weighs in favor of admission. <u>See</u> <u>Carrion</u>, 249 N.J. at 282-83. However, the record does not support, as the trial court did, determining two interview rooms within the same secure area of a small stationhouse are "a clear and substantial break in place," <u>see</u> <u>ibid.</u>, especially considering detectives changed rooms under the guise that the reason was simply to record the statement defendant initially

provided. Put simply, this "was part of an unbroken interrogation." See O'Neill, 193 N.J. at 183. Accordingly, this factor stands in equipoise.

Finally, the first O'Neill factor, the extent of questioning and nature of admissions, also favors suppression. The trial court vastly departed from our well established law to find defendant's initial nearly hour and a half interrogation was relatively brief. See Carrion, 249 N.J. at 279 (acknowledging the ninety-five-minute initial interrogation in O'Neill was part of a "quintessential" example of a factor one analysis that favors suppression).

Additionally, the officer's inquisition during the first interview was extensive. Even though defendant denied knowing anything about A.S.'s disappearance and stated he only saw her on his way out of their apartment complex earlier that day, detectives prodded deep into his familial background, history of neglect and mental health issues, and, just like the detectives in O'Neill, "focused on defendant's [specific] whereabouts" throughout the remainder of the day and evening. See O'Neill, 193 N.J. at 182. And, as already discussed and contrary to the trial court's determination, those whereabouts he provided were inculpatory and the ammunition detectives used in the second interrogation. In other words, the first O'Neill factor clearly favors suppression as well.

In sum, factors one, three, four, five qualitatively, in this particular case, outweigh factor two; and "[u]nder these circumstances[, after applying, the O'Neill considerations,] we cannot conclude beyond a reasonable doubt that [defendant] knowingly and voluntarily waived his Miranda rights when providing his second statement." Carrion, 249 N.J. at 261.

The matter is therefore remanded to the trial court for entry of an order granting defendant's suppression motion, allowing defendant to withdraw his plea and the matter tried or otherwise resolving the matter. See O'Neill, 193 N.J. at 167; R. 3:9-3(f) ("If the defendant prevails on appeal, the defendant shall be afforded the opportunity to withdraw his or her plea.").

Based on our decision regarding the inadmissibility of defendant's statements, we need not consider his contentions about his sentence.

Reversed in part; vacated and remanded in part for further proceedings consistent with our opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4408-18